Electronically FILED by Superior Court of California, County of Los Angeles on 09/08/2021 02:06 PM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Mariano,Deputy Clerk

Case 2:21-cv-08381-AB-AFM   Document 1-1   Filed 10/22/21   Page 1 of 26   Page ID #:8
20STCV33886

**SUM-100**

# SUMMONS   - First Amended Complaint
## (CITACION JUDICIAL)

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
 CITY OF BEVERLY HILLS; "Additional Parties Attachment form is attached."

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

ASHLEY BLACKMON, an individual,

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

   You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

   *Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

   *Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*  Stanley Mosk Courthouse, 111 N. Hill Street, Los Angeles, CA 90012

CASE NUMBER: *(Número del Caso):*
20STCV33886

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Morgan Ricketts, 3435 Wilshire Boulevard Suite 2910, Los Angeles, CA 90010, (213) 995-3935

DATE: 09/08/2021        Sherri R. Carter Executive Officer / Clerk of Court        , Deputy
*(Fecha)*                            *(Secretario)*        M. Mariano        *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010).)*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of (specify):

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date)*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100  [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**EXHIBIT A**

8

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| BLACKMON v. CITY OF BEVERLY HILLS, et al. | 20STCV33886 |

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

BEVERLY HILLS POLICE
SERGEANT KEVIN ORTH,
JAMES KEENAGHAN, BEVERLY
HILLS POLICE OFFICER ADAM
FALOSSI (#04678), BEVERLY
HILLS POLICE OFFICER
STEPHEN COMP, BEVERLY
HILLS POLICE OFFICER
JONATHAN DE LA CRUZ,
BEVERLY HILLS POLICE
OFFICER MICHAEL DOWNS, all
sued in their individual capacities;
and DOES 1-10, inclusive;
Defendants.

Page _____ of _____

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

**EXHIBIT A**

9

Morgan Ricketts (Bar No. 268892)
**RICKETTS LAW**
540 El Dorado Street #202
Pasadena CA 91101
T: (213) 995-3935. F: (213) 995-3963
Email: morgan@morganricketts.com
Attorney for Plaintiff Ashley Blackmon

**FILED**
Superior Court of California
County of Los Angeles
08/24/2021
Sherri R. Carter, Executive Officer / Clerk of Court
By: _____ M. Carino _____ Deputy

**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

ASHLEY BLACKMON, an individual,

      Plaintiff,

    v.

CITY OF BEVERLY HILLS; BEVERLY HILLS POLICE SERGEANT KEVIN ORTH, JAMES KEENAGHAN, BEVERLY HILLS POLICE OFFICER ADAM FALOSSI (#04678), BEVERLY HILLS POLICE OFFICER STEPHEN COMP, BEVERLY HILLS POLICE OFFICER JONATHAN DE LA CRUZ, BEVERLY HILLS POLICE OFFICER MICHAEL DOWNS, all sued in their individual capacities; and DOES 1-10, inclusive;

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:  20STCV33886

~~[PROPOSED]~~ **FIRST AMENDED COMPLAINT FOR**
1. **FALSE ARREST**
2. **EXCESSIVE FORCE**
3. **CIVIL CODE § 52.1**
4. **UNREASONABLE SEARCH**
5. **ASSAULT AND BATTERY**
6. **FOURTH AMENDMENT VIOLATION (42 U.S.C. § 1983)**
7. **FOURTEENTH AMENDMENT VIOLATION (42 U.S.C. § 1983)**
8. **MUNICIPAL LIABILITY (42 U.S.C. § 1983)**

**DEMAND FOR JURY TRIAL**

Electronically Received 08/24/2021 09:39 PM

1

**EXHIBIT A**

~~[PROPOSED]~~ FIRST AMENDED COMPLAINT

# I. PARTIES

1.      Plaintiff Ashley Blackmon at all times relevant to this First Amended Complaint was a resident of Los Angeles County, California.

2.      Defendant Beverly Hills Police Department Sergeant Kevin Orth is, on information and belief, a resident of Los Angeles County, California.

3.      Defendant Beverly Hills Police Department Sergeant James Keenaghan is, on information and belief, a resident of Los Angeles County, California.

4.      Defendant Beverly Hills Police Department Officer Adam Falossi is, on information and belief, a resident of Los Angeles County, California.

5.      Defendant Beverly Hills Police Department Officer Stephen Comp is, on information and belief, a resident of Los Angeles County, California.

6.      Defendant Beverly Hills Police Department Officer Jonathan De La Cruz is, on information and belief, a resident of Los Angeles County, California.

7.      Defendant Beverly Hills Police Department Officer Michael Downs is, on information and belief, a resident of Los Angeles County, California.

8.      Plaintiff is informed and believe, and based thereon alleges, that at all times material herein, the Officer Defendants (Orth, Keenaghan, Falossi, Comp, De La Cruz, and Downs, collectively) were duly appointed and acting police officers or employees employed as such by the City of Beverly Hills, California, and in undertaking the acts of which Plaintiff complains, Defendants were acting within the course and scope of such employment and under the color of law.  Officer Defendants are sued in their individual capacities.

9.      Defendant Beverly Hills is a duly organized and existing municipal entity which operates and is responsible for the Beverly Hills Police Department ("BHPD").

10.      Plaintiff is informed and believes, and based thereon alleges, that at all times mentioned below, each Defendant was the agent or co-conspirator of the remaining Defendants, and each other, and that in doing the acts alleged, each of the Defendants were acting within the course and scope of their agency, employment,

2

[PROPOSED] FIRST AMENDED COMPLAINT

partnership, conspiracy, or other authorized relationship with the other Defendants and with the permission and ratification of Defendants.  Specifically, Defendant Beverly Hills permitted, tolerated and condoned the pattern and practice of Beverly Hills officers complained of herein and ratified the specific acts of individual Defendants complained of herein, knowing the basis therefor. Whenever and wherever reference is made in this Complaint to any acts of Defendants, such allegations and references shall also be deemed to mean the acts of each Defendant acting individually, jointly or severally.

## II. EXHAUSTION OF ADMINISTRATIVE REMEDIES

11.    Within six months of the incident, counsel for Plaintiff sent correspondence to the City of Beverly Hills that put these defendants on notice of the state law tort claims against them pursuant to California Government Code § 910 et seq.  Plaintiff's claims were denied by operation of law within six months of the filing of this complaint.  Plaintiff exhausted all administrative remedies available to her and timely filed this action.

## III. STATEMENT OF FACTS
### BEVERLY HILLS BACKGROUND

12.    At the time of the acts complained of herein, the Beverly Hills Police Department engaged in a pattern and practice of racial discrimination and harassment of Black individuals in the City of Beverly Hills.

13.    The City has long had problems with racial bias and discrimination in leadership. For example, its former Chief of Police, Sandra Spagnoli, was chosen in 2016 over the most qualified applicant for the Chief of Police job, because the most qualified applicant was a Black woman and, on information and belief, the City Council did not want a Black woman as "the face of Beverly Hills." Since being given the role of Chief, Spagnoli has been sued multiple times by Department employees for

3

**EXHIBIT A**
[PROPOSED] FIRST AMENDED COMPLAINT

racist, anti-Catholic, anti-Semitic, and homophobic remarks; she demoted six Black civilian supervisors and replaced them with younger white people who had little to no experience; and she cancelled a study aimed at improving salaries for minorities in the Department. After employees complained about a Sergeant Scott Dowling calling Black officers "stupid and lazy, and members of the black Mafia" and sharing a video that contained negative racial stereotypes about Black people, Spagnoli promoted Dowling to Lieutenant within days. Since then, he has been further promoted to Captain – a position just below Chief and Assistant Chief. The Department did not respond to media requests for comment on this Department leader's racially inappropriate language, and continues to look the other way when it comes to acknowledging and addressing the racism in its ranks. On May 15, 2020, Spagnoli was forced to retire due to over two dozen lawsuits alleging misconduct by her. During all times relevant to this Complaint, Spagnoli was Chief of Police for the City of Beverly Hills.

14.     On information and belief, Captain Dowling was, at all relevant times, and remains a very influential voice in the Department – to the detriment of Black people in Beverly Hills. Dowling has been accused of subjecting biracial employees to adverse actions, as well as Caucasian employees who date Black people.

15.     The Department put Dowling in charge of a task force after the murder of George Floyd. On information and belief, this task force has arrested 106 people to date; 105 are Black. The remaining arrestee is not Black, but is very dark-skinned. This task force has effectively targeted Black individuals for racially discriminatory policing.

16.     On information and belief, Sergeant Orth, a white officer from Simi Valley, is one of the primary supervisors of the task force physically overseeing the racially disparate arrests.  On information and belief, the Department has received complaints that Orth regularly participates in harassing people of color in the City of Beverly Hills, but has never disciplined or counseled him on the issue, and has not

4

1 used the capabilities of its public safety software to place Orth into a monitored status

2 so that complaints and other issues can be automatically flagged.

3       17.     In 2018, a community activist had been told by numerous people of color

4 that Beverly Hills Police Department officers, and particularly Sergeant Orth, were

5 detaining them just for walking in the City; thereafter, the activist observed Sergeant

6 Orth talking to a young Hispanic man on a sidewalk wearing a backpack, and stopped

7 to observe the interaction. The young Hispanic man who had been detained told the

8 activist that he too had been stopped just for walking on a sidewalk, then asked

9 Sergeant Orth if he was free to go. Orth let him leave at that point, further

10 corroborating the young man's claim that he had not been doing anything wrong, only

11 walking. On July 5, 2020, the activist spoke with Supervisor Tomlin about the stop by

12 Sergeant Orth; Supervisor Tomlin was aware of the circumstances of the stop and had

13 nothing substantive to say in defense of the stop, but demanded that the activist cease

14 posting so many negative things online about the Beverly Hills Police Department, and

15 post at least as many positive things about the Department.

16       18.     On October 1, 2020, the same activist observed Beverly Hills officers

17 participating in a traffic stop of a Black driver and Black passenger near Rodeo Drive.

18 The stop involved at least four officers and three police vehicles; two of the officers

19 repeatedly refused to give their names when asked by the activist, who was attempting

20 to film them, and treated the would-be videographer with obvious hostility. Ultimately,

21 the officers let the Black driver and passenger go without even a citation. On

22 information and belief, this was done because they had done nothing wrong. Despite

23 the apparent lack of any probable cause to stop them, the Beverly Hills officers asked

24 the passenger for his identification as well as the driver. This is a common practice in

25 Beverly Hills and elsewhere that is not typically followed for white individuals,

26 exposing Black people to more intrusive policing than white people and resulting in

27 more Black people than white people becoming and remaining entangled in the

5

EXHIBIT A

14

1   criminal justice system, creating further biased data to support a practice of

2   overpolicing Black people.

3       19.    On October 2, 2020, the task force stopped and searched Versace's Vice

4   President of Mens Footwear, Salehe Bembury, a Black man who was actively holding

5   a Versace shopping bag after having shopped at a Versace location on Rodeo Drive.

6   The task force asked for his ID and ran his name for wants and warrants. Allegedly, he

7   had jaywalked. On information and belief, jaywalking in that part of Rodeo Drive is

8   very common and, when white individuals jaywalk, officers do not typically stop them,

9   much less search them or ask them for ID to run their names for wants and warrants.

10      20.    On information and belief, the task force was also responsible for the high

11  profile and disturbing arrest on video of a Black man in a suit riding a scooter on

12  October 17, 2020, for the alleged crime of either riding a scooter without ID or lying

13  about his identity when stopped and asked by officers; when his female companion

14  attempted to get their car keys before he was taken away in a squad car, she was

15  arrested too, despite the presence of a large crowd of people who were verbally

16  expressing shock and dismay at the excessive policing.  Defendant De La Cruz was

17  involved in this incident and is a member of the racially discriminatory task force.

18      21.    Beverly Hills police officers' differential treatment of Black people

19  includes exposing Black individuals to greater risks of physical harm, specifically

20  during traffic stops. In a standard traffic stop, an officer uses lights, sirens, or an

21  amplification device to instruct a driver to pull over and submit to a traffic stop, then

22  approaches the vehicle's driver or passenger side to ask for license and registration.

23  Weapons are not used or displayed, occupants are not asked to exit the car, and they

24  are not handcuffed or placed in a police vehicle.

25      22.    Under certain circumstances specified by Ninth Circuit law, officers may

26  instead choose to use a different procedure in stops that involve a heightened potential

27  for violence: the "high-risk traffic stop" procedure.  This procedure differs from the

standard traffic stop in important ways: it involves aiming guns at all occupants in the

**EXHIBIT A**

[PROPOSED] FIRST AMENDED COMPLAINT

vehicle once the driver has pulled over; ordering occupants to put their hands out the windows, throw the car keys out of the window, then open their own door and exit the vehicle with their hands up, face forward while walking backward to submit to handcuffing; and when they reach the officers, to kneel down or lie prone on the ground for handcuffing. Thereafter, the person is locked in a police vehicle until officers complete their investigation, at which point, if officers agree no crime has been committed, they are released.

23.     This extremely intrusive and traumatic "high-risk traffic stop" procedure may not be used indiscriminately, simply because officers subjectively are concerned for their safety, or because statistically traffic stops are dangerous for officers. It is reserved for traffic stops that require extra protection for officers, such as when the individual is suspected of a violent crime, is suspected of being armed, or officers have information that the individual is planning to commit a violent crime.  The high-risk traffic stop procedure may not be used based on statistical analysis associating particular groups with violent behavior, such as a claim that car thieves are more likely to violently resist traffic stops. Officers must make an individualized determination based on the facts and circumstances before them in deciding to use the high-risk traffic stop procedure, and in general before engaging in highly intrusive police actions such as pointing guns at a citizen, handcuffing a citizen, or placing a citizen in a police vehicle.

24.     Generally, police officers do not use the high-risk traffic stop procedure on drivers who are compliant and not suspected of a violent crime, but on information and belief, Beverly Hills officers use the high-risk traffic stop procedure in numerous circumstances where they otherwise would not, when the driver is Black.

### THE INCIDENT

25.     Plaintiff Ashley Blackmon was thirty years old and had recently moved from New York City to Marina Del Rey for a job at Red Bull corporate headquarters as a brand manager.

**EXHIBIT A**

[PROPOSED] FIRST AMENDED COMPLAINT

**16**

26.   When Plaintiff moved to Marina del Rey in July 2019, she leased a 2019 black Toyota Rav-4, which she parked primarily either in her apartment complex's secured parking garage while she was at home, or in Red Bull's secured parking garage while she was at work. The license plate issued to Plaintiff's black 2019 Toyota at the time was 8KYC428.

27.   On February 9, 2020, Plaintiff was driving in the Toyota Rav-4 through Beverly Hills around 9:30 a.m. on her way to a Sunday morning yoga class. Plaintiff is Black, and on that day was wearing her long hair in a ponytail, gold medium size hoop earrings, gold-rimmed cat-eye sunglasses, a light blue denim jeans jacket, and yoga pants.

28.   Plaintiff has no criminal history and has never committed any crime.  She habitually obeys all traffic laws, which she also obeyed on that day.

29.   Plaintiff drove through the intersection at La Cienega and Gregory Way in Beverly Hills, which is equipped with an automated license plate reader device ("ALPR").  The ALPR device read Plaintiff's license plate, 8HCW465, which was associated with a gray 2018 Toyota that had been reported stolen three months earlier on November 20, 2019.  A car thief had stolen her lawfully issued plates without her knowledge, and replaced them with similar looking plates: instead of 8KYC428, she now had a plate that read 8HCW465.

30.   The ALPR reader reported Plaintiff's license plate as stolen, and dispatch in turn notified Falossi and Comp, who began to follow Plaintiff north out of Beverly Hills on La Cienega Boulevard in separate patrol vehicles. On information and belief, Defendants knew that the stolen plate was likely caused by a "plate swap" in which a car thief steals one car, then replaces its license plates with plates from another car, thereby ensuring that the stolen car can be driven without arousing suspicion. Often, the thief will take the additional step of replacing the other car's now-missing license plates with the stolen plates, so that it is less obvious that the license plates have been stolen, and the plate theft may go undiscovered for longer. Thieves know that when

8

police run a license plate to see if it is associated with a stolen car, some information about the stolen car is provided to the inquiring officer, such as make, model, color, and year; therefore, thieves often steal license plates from cars that are the same as the stolen car in make, model, color, and year, when possible.

31.   Defendants are aware of this criminal practice of "swapping" plates on stolen cars to avoid detection.  In this case, the stolen car was a 2019, whereas the stolen vehicle was a 2018 model; in addition, the stolen car was a gray Toyota while the Toyota Plaintiff was driving was black.  Prior to pulling Plaintiff over, Falossi communicated about the color discrepancy to dispatch, stating, "I don't know if this was a plate swap or not."  Dispatch responded and acknowledged the discrepancy, stating that Plaintiff's car "looks black in the photo" (meaning the photo of Plaintiff's car taken by the Automated License Plate Reader device as she drove through the intersection) "but it states it's a gray color" referring to the reported information about the stolen car.

32.   In addition to specific details about the stolen car's description not matching Plaintiff's car, the stolen car had been reported on November 20, 2019 – nearly three months prior to the stop in this case on February 9, 2020.  Most car thieves do not remain in possession of the stolen car for long. Defendants knew or should have known that the chances a car thief would still be in the same car three months later, still bearing plates which the thief knows will have been reported as stolen, and that the thief would also be driving on major streets through intersections equipped with ALPR systems, are slim to none.

33.   Suddenly, without any traffic violations on Plaintiff's part, mere streets away from her yoga class, Falossi ordered her to pull over. Plaintiff immediately parked the car, and noticed at that same moment that there were three guns pointing at her.  In fact, five officers pointed their guns at Plaintiff or her car during that stop: Defendants Keenaghan, Falossi, Comp, De La Cruz, and Downs, while Orth supervised. The stop occurred on La Cienega Boulevard, which is a main thoroughfare

9

in the City of Beverly Hills. All of these Defendants had either seen her driving the car alone or had been made aware that the lone driver was Black.  Falossi and possibly other officers ordered her to put her hands outside of the car, and she complied.  Then, Falossi (and possibly another officer) ordered her to unbuckle her seatbelt, toss her keys out of the window, open her car door, and get out of her car.

34.    Prior to pulling Plaintiff over at gunpoint, Officer Falossi or another officer made a note of her race on the radio to dispatch and requested air support. Beverly Hills does not have an air support division, and so the responding helicopter was sent by the Los Angeles Police Department instead, at an estimated cost of over $2,000 in taxpayer dollars.

35.    On information and belief, the only reason Plaintiff was stopped by more than one or two police officers in the first place is because she is Black.  Had Plaintiff been white, officers would have simply pulled her over and approached the car respectfully, in an ordinary traffic stop procedure, without ordering her to put her hands out the window.  Black people are frequently pulled over by police and immediately treated as threats, as evidenced by orders to put their hands up, throw their keys out of the car, step out of their cars, kneel down or lie prone, and submit to handcuffing, all at gunpoint, whereas Caucasian people are rarely asked to do any of these things and rarely treated as threats – even if they are not cooperative or actively hostile.

36.    Although Plaintiff was at all times compliant, communicative, and cooperative with officers, she was initially unable to immediately comply with Falossi's directions because he, Officer Comp, Officer De La Cruz, and Officer Downs were each pointing loaded guns directly at her head, and she was too afraid to move her hands to reach for her keys or seatbelt buckle; she verbally communicated with the officers to ensure they did not believe she was disobeying them on purpose. Plaintiff was afraid of them because in several high-profile cases, Black drivers have been instructed to do something by police officers, and then been shot when they moved to

10

comply – or even without moving.  Plaintiff, in fear for her life and terrified to move any part of her body, explained that she could not reach her keys because they were in her purse, and asked if an officer would come and help her undo her seatbelt and open the car door so that she would not have to move her hands.

37.    Despite Plaintiff's request, no Defendant agreed to help her unbuckle herself or open her car door.  On information and belief, the reason officers Comp, De La Cruz, Downs, and Falossi continued to point guns at Plaintiff even though she was clearly in extreme distress and was nonthreatening, was because she is Black.

38.    At some point, with extreme anxiety, Plaintiff was able to unbuckle herself and get out of her car.  She was ordered to walk backward towards the sound of Officer Falossi's voice, until she reached him, when he ordered her to get onto her knees.  The order terrified Plaintiff because she did not know what was going to happen to her or what the officers were going to do to her.  She begged to know what was happening, but no one explained.

39.    After Plaintiff had knelt down on the asphalt in the middle of La Cienega Boulevard, Officer Comp ordered Plaintiff to put her hands behind her back and to place her palms together as though she were praying.  Plaintiff is a person of deep faith who regularly prays and attends church; at hearing this, she experienced extreme anguish, fear, and humiliation, and did not understand what she was supposed to be praying for; in her terrified state, she was in genuine fear that she was about to be killed in the street.

40.    Although Plaintiff pleaded in terror to know what was going on, Defendant Comp placed handcuffs on Plaintiff in violation of her rights without even telling her why she had been stopped, much less why she was being handcuffed and having guns pointed at her, or what would happen next.

41.    No officer at the scene attempted to use any less lethal means to protect themselves, in the event Plaintiff ceased to comply with police orders.  No officer made any effort to prepare a Taser, beanbag gun, rubber bullet gun, or chemical

11

1   weapon such as pepper spray. All officers present went directly to the most extreme

2   weapon available to them: firearms.

3       42.   On information and belief, all the officers who pointed guns at Plaintiff

4   have been trained never to point a gun at anything they are not willing to destroy. Each

5   Defendant was willing to destroy Plaintiff based on nothing more than a report of a

6   stolen license plate.

7       43.   Numerous individuals at the scene saw Plaintiff being stopped by police,

8   causing her embarrassment and humiliation.

9       44.   Officers searched Plaintiff's person and her entire car, including her trunk,

10  without her consent and with no warrant or exigent circumstance to justify the search.

11  This was unreasonable under the circumstances, as Plaintiff had a reasonable

12  expectation of privacy in the contents of her car and trunk.  Officers also searched

13  Plaintiff's purse and wallet, and although Plaintiff agreed to allow this, she agreed

14  while she was still in handcuffs in the back of a police car, desperate to prove that

15  there had been a misunderstanding; this is hardly true consent.

16      45.   Within minutes, Defendants realized that they had picked the wrong

17  person.  Only then did they unhandcuff her and begin to explain that they had thought

18  her car was stolen because the ALPR had reported her plate as stolen.

19      46.   Defendants removed Plaintiff's license plates and gave her a handwritten

20  piece of paper that they claimed would explain the situation if she were pulled over

21  again by police on her way home.  Instead, they should have escorted her home, waited

22  with her to call for a ride, or called a tow truck for her at their own cost.  Plaintiff was

23  forced to call a tow truck and pay for a ride home for herself rather than risk repeating

24  the trauma or having an even worse experience with police before she could explain

25  why she did not have license plates.

26      47.   Plaintiff remains afraid to drive through or near Beverly Hills, particularly

27  if she is alone, and experienced significant emotional distress and physical injury from

this incident.

12

**EXHIBIT A**
[PROPOSED] FIRST AMENDED COMPLAINT

21

48.     After the incident, BHPD officers chose to post on social media about the incident from their official account, providing only information that was favorable to them and omitting information that was favorable to her, thus causing numerous people to believe that the incident was justified and that Plaintiff had deserved the trauma inflicted by BHPD. This caused Plaintiff further emotional distress.

## IV. CLAIMS

### FIRST CLAIM FOR RELIEF

**FALSE ARREST/UNREASONABLE SEIZURE IN VIOLATION OF CAL. CONST. ART. I § 13 AND CAL. CIV. CODE § 52.1**

**(Against Defendants Falossi, Comp, De La Cruz, Downs, Keenaghan, and Orth)**

49.     Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 48.

50.     On February 9, 2020, Officer Defendants Falossi, Comp, De La Cruz, Downs, Keenaghan, and Orth, employed by Defendant City of Beverly Hills, unreasonably seized Plaintiff as she was driving innocently through Beverly Hills by conducting an unreasonable and unjustified traffic stop.  Defendants seized her without probable cause, without reasonable suspicion, without consent, without a warrant, and without a warrant exception, which violated her rights under the California Constitution, Article I Section 13.

51.     The above-described actions of Defendants deprived Plaintiff of her rights under Article I Section 13 of the California Constitution to be free from unreasonable seizures.  These acts also constitute threats, intimidation, or coercion of Plaintiff, interfering with or attempting to interfere with her exercise or enjoyment of the above-enumerated rights, including the right to travel freely.  In addition, these acts constitute the common law tort of false arrest.

52.     All actions herein complained of by Defendants were undertaken in the course and scope of their duties as duly sworn police officers employed by the City of

13

**EXHIBIT A**

Beverly Hills, and at all times, Defendants were acting under color of law. Further, Defendant City of Beverly Hills failed to supervise, train, and discipline Defendants.

53.     Pursuant to California Civil Code section 52.1, Plaintiff is entitled to claim for damages for the deprivation of her rights under the California Constitution. Defendants' conduct caused Plaintiff damages in an amount to be proven at trial. Plaintiff experienced significant emotional distress as a result of Defendants' actions. Plaintiff is entitled to compensation for the emotional distress she experienced as a result of Defendants' conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since the Defendants' actions were malicious, sadistic, willful, wanton, committed with the very purpose of causing harm, the specific intent to deprive Plaintiff of her rights, and/or in conscious disregard for Plaintiff's rights.

## SECOND CLAIM FOR RELIEF
## EXCESSIVE FORCE IN VIOLATION OF CAL. CONST. ART. I § 13
**(Against Defendants Falossi, Comp, De La Cruz, Downs, Keenaghan, and Orth, and Does 1-10)**

54.     Plaintiffs reallege and incorporate by reference herein each and every allegation set forth in paragraphs 1 through 48.

55.     On February 9, 2020, Defendants Falossi, Comp, De La Cruz, Downs, Keenaghan, Orth, and Doe Defendants employed by Defendant City of Beverly Hills, ordered, permitted, and later ratified the use of multiple guns to be pointed at Plaintiff, for Plaintiff to be removed from her vehicle, for Plaintiff to be ordered to get onto her knees on a rough road, and to place handcuffs on Plaintiff in an overly tight fit.  All of the above is excessive force in violation of California Constitution Article I Section 13, and Defendant City of Beverly Hills failed to train, supervise and discipline officers to prevent this from occurring.

56.     These Defendants had no right to use any force on Plaintiff at all, because she was innocent of any crime, was cooperative and compliant, and had not given officers any reason to use force on her.

14

57.     However, even if Defendants had the right to use some degree of force, the force used was unnecessary, unreasonable, and excessive, and done for the very purpose of causing harm.  Plaintiff was compliant and was not a threat and was not behaving in a manner that justified treating her as described.

58.     The above-described actions of these Defendants deprived Plaintiff of her right under Article I, section 13 of the California Constitution to be free from unreasonable seizures.  These acts constitute threats, intimidation, or coercion of Plaintiff, interfering with or attempting to interfere with her exercise or enjoyment of the above-enumerated rights.

59.     All actions herein complained of by Defendants were undertaken in the course and scope of their duties as duly sworn police officers employed by the City of Beverly Hills, and at all times, Defendants were acting under color of law, and Defendant City of Beverly Hills failed to train, supervise and discipline officers to prevent this from occurring.

60.     Pursuant to California Civil Code section 52.1, Plaintiff is entitled to claim for damages for the deprivation of her rights under the California Constitution. Defendants' conduct caused Plaintiff damages in an amount to be proven at trial. Plaintiff experienced significant emotional distress as a result of Defendants' actions. Plaintiff is entitled to compensation for the emotional distress she experienced as a result of Defendants' conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since the Defendants' actions were malicious, sadistic, willful, wanton, committed with the very purpose of causing harm, the specific intent to deprive Plaintiff of her rights, and/or in conscious disregard for Plaintiff's rights.

### THIRD CLAIM FOR RELIEF
### DEPRIVATION OF RIGHTS IN VIOLATION OF CAL. CIV. CODE § 52.1
### (Against Defendants Falossi, Comp, De La Cruz, Downs, Keenaghan, and Orth, and Does 1-10)

15

61.    Plaintiff realleges and incorporates by reference herein each and every allegation set forth in paragraphs 1 through 48.

62.    The individual Defendants' actions in pulling Plaintiff over, immediately ordering her out of her car, refusing to assist her to unbuckle her seatbelt or open her car door, placing her in fear of her life due to the guns pointed at her, ordering her to walk backwards and kneel, and then placing handcuffs on her and placing her into a patrol car, all constituted threats, intimidation, and/or coercion.

63.    The above-described actions of the Defendants deprived Plaintiff of her rights under Article I, Section 13 of the California Constitution by targeting and punishing her specifically because she had exercised her right to travel freely.

64.    The Defendants' use of violence and police authority to punish and intimidate Blackmon against traveling freely through the City of Beverly Hills constitute threats, intimidation, and/or coercion depriving her of a right guaranteed by California's constitution in violation of California Civil Code section 52.1.

65.    All actions herein complained of by the Defendants were undertaken in the course and scope of their duties as duly sworn police officers employed by the City of Beverly Hills, and at all times, Defendants were acting under color of law.

66.    Pursuant to California Civil Code section 52.1, Plaintiff is entitled to claim for damages for the deprivation of her rights under the California Constitution by means of threats, intimidation, or coercion. Defendants' conduct caused Plaintiff damages in an amount to be proven at trial.  Plaintiff experienced significant emotional distress as a result of Defendant's actions.  Plaintiff is entitled to compensation for the emotional distress she experienced as a result of Defendants' conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since the Defendants' actions were malicious, sadistic, willful, wanton, committed with the very purpose of causing harm, the specific intent to deprive Plaintiff of her rights, and/or in conscious disregard for Plaintiff's rights.

**FIFTH CLAIM FOR RELIEF**

16

EXHIBIT A

25

## UNREASONABLE SEARCH IN VIOLATION OF CALIFORNIA CONSTITUTION ART. I § 13

**(Against Defendants Falossi, Comp, Downs, De La Cruz, Keenaghan, and Orth)**

67.    Plaintiff realleges and incorporates by reference herein each and every allegation set forth in paragraphs 1 through 48.

68.    On February 9, 2020, Defendant Falossi, Orth, Comp, Downs, De La Cruz, and Keenaghan, employed by Defendant City of Beverly Hills and acting under color of state law, pulled Plaintiff over without probable cause or reasonable suspicion, warrant, or consent.  They then used excessive force and handcuffed her.  Although she was no threat to them and there was no suggestion that she might have contraband or evidence of a crime, Defendants searched her car, which was unreasonable under the circumstances, and opened her trunk, and questioned her about the contents of her trunk, and BHPD failed to train, supervise and discipline officers to prevent this from occurring.

69.    Plaintiff did not consent to the search, and Defendants had no warrant to conduct the search, and no reasonable law enforcement need to search her car or her trunk.

70.    Plaintiff was harmed and offended by the search.

71.    A reasonable person would have been harmed and offended by the search.

72.    Defendants' conduct deprived Plaintiff of her rights, also causing her damages in an amount to be proven at trial.  Plaintiff experienced significant emotional distress as a result of Defendants' actions.  Plaintiff is entitled to compensation for the emotional distress she experienced as a result of Defendants' conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since the Defendants' actions were malicious, sadistic, willful, wanton, committed with the very purpose of causing harm, the specific intent to deprive Plaintiff of her rights, and/or in conscious disregard for Plaintiff's rights.

## SIXTH CLAIM FOR RELIEF

### ASSAULT AND BATTERY

17

**(Against Defendant Comp)**

73.     Plaintiff realleges and incorporates by reference herein each and every allegation set forth in paragraphs 1 through 44.

74.     On February 9, 2020, Defendant Comp intentionally placed handcuffs on Plaintiff.

75.     Plaintiff did not consent to be touched by Comp at all, and neither Falossi nor any other officer had a legal right to do so.

76.     Plaintiff was harmed and offended by Comp's conduct.

77.     A reasonable person would have been harmed and offended by Defendant Comp's conduct.

78.     Defendant Comp's conduct deprived Plaintiff of her rights, also causing her damages in an amount to be proven at trial.  Plaintiff experienced significant emotional distress as a result of Defendant's actions.  Plaintiff is entitled to compensation for the emotional distress she experienced as a result of Defendant's conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since the Defendant's actions were malicious, sadistic, willful, wanton, committed with the very purpose of causing harm, the specific intent to deprive Plaintiff of her rights, and/or in conscious disregard for Plaintiff's rights.

## SEVENTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – FOURTH AMENDMENT VIOLATION
**(Against Defendants Falossi, Comp, De La Cruz, Downs, Keenaghan, Orth)**

79.     Plaintiff realleges and incorporates by reference herein each and every allegation set forth in paragraphs 1 through 48.

80.     Pointing guns at a citizen is a use of force under established Ninth Circuit law even if the gun is never fired.

81.     When Defendants pointed guns at Plaintiff, forced her onto her knees, handcuffed her, and put her in the back of a patrol car, they used excessive and unreasonable force that was disproportionate to the situation at hand, which was an investigation of a nonviolent crime with an obviously compliant and cooperative driver

18

**EXHIBIT A**
[PROPOSED] FIRST AMENDED COMPLAINT

who was not suspected of being armed, of having ever committed any crime – much less a violent one – or of intending to commit any particular violent crime in the future. Further, it was unreasonable for officers to assume that the person driving the car was the car thief, when the car had been reported stolen three months earlier.  Officers should have instead been sensitive to the fact that Plaintiff's plates had most likely been swapped.

82.   Officers had less intrusive and available alternatives to pointing guns at Plaintiff, placing her on her knees, handcuffing her, and putting her in the back of a patrol car, such as keeping their guns ready but pointed at the ground and not directly at Plaintiff, preparing an electronic control device such as a Taser rather than a firearm for use in the event Plaintiff began to resist, or asking Plaintiff to read her Vehicle Identification Number to them so that they did not need to approach the car to gain an initial understanding of whether the car was stolen.

83.   All of Defendants' actions were unreasonable seizures and limitations on Plaintiff's liberty as well as excessive force.

84.   At all relevant times, Defendants Falossi, Comp, De La Cruz, Downs, Orth, and Keenaghan were acting under color of state law.  No Defendant intervened to stop the remaining Defendants from treating Plaintiff in a manner inconsistent with her rights and common decency.  Orth and Keenaghan, though supervisors with authority to discipline, counsel, and direct the remaining Defendants, failed to supervise and failed to discipline them for this violation of constitutional rights, and instead personally participated in the violation of rights.

85.   Defendants' conduct deprived Plaintiff of her rights, also causing her damages in an amount to be proven at trial.  Plaintiff experienced significant emotional distress as a result of Defendants' actions.  Plaintiff is entitled to compensation for the emotional distress she experienced as a result of Defendants' conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since Defendants' actions were malicious, willful, committed with the specific intent to deprive Plaintiff of her rights, and/or in conscious disregard for Plaintiff's rights.

19

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## EIGHTH CLAIM FOR RELIEF

## 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT VIOLATION

## (Against Defendants Falossi, Comp, De La Cruz, Downs, Keenaghan, Orth)

86.     Plaintiff realleges and incorporates by reference herein each and every allegation set forth in paragraphs 1 through 48.

87.     When Defendants pointed guns at Plaintiff, forced her onto her knees, handcuffed her, and put her in the back of a patrol car, they did so not because she individually did anything wrong in the situation, but because they perceived that she was Black. Defendants, on information and belief, have never victimized a white driver with this procedure absent individualized circumstances demonstrating that the white driver was noncompliant, armed, had committed a violent crime or was about to commit a violent crime, or was otherwise behaving in a threatening manner. Therefore, their conduct with respect to Plaintiff constituted purposeful race discrimination.

88.     Defendants' conduct deprived Plaintiff of her right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

89.     At all relevant times, Defendants Falossi, Comp, De La Cruz, Downs, Orth, and Keenaghan were acting under color of state law.  No Defendant intervened to stop the remaining Defendants from treating Plaintiff in a manner inconsistent with her rights and common decency.  Orth and Keenaghan, though supervisors with authority to discipline, counsel, and direct the remaining Defendants, failed to supervise, counsel, or discipline them for this violation of constitutional rights, and instead personally participated in the violation of rights.

90.     Defendants' conduct deprived Plaintiff of her rights, also causing her damages in an amount to be proven at trial.  Plaintiff experienced significant emotional distress as a result of Defendants' actions.  Plaintiff is entitled to compensation for the emotional distress she experienced as a result of Defendants' conduct; costs and reasonable attorney's fees incurred in prosecuting this claim for relief; and punitive damages, since Defendants' actions were malicious, willful, committed with the

20

[PROPOSED] FIRST AMENDED COMPLAINT

specific intent to deprive Plaintiff of her rights, and/or in conscious disregard for Plaintiff's rights.

### NINTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – *MONELL* VIOLATION
### (Against Defendant City of Beverly Hills)

91.    Plaintiff realleges and incorporates by reference herein each and every allegation set forth in paragraphs 1 through 48.

92.    The City of Beverly Hills' employees, while acting under color of state law, deprived Plaintiff of her particular rights under the laws of the United States and the constitution of the United States, and the City of Beverly Hills' final policymakers, having final policymaking authority granted to them by the City of Beverly Hills concerning the acts of the individual Defendants, knew of and specifically made a deliberate choice to approve their acts and the basis for them.

93.    The City of Beverly Hills, through its Police Department, engages in a custom and practice of treating all stolen vehicle stops as high risk, even if individual circumstances do not justify pointing loaded guns directly at drivers, forcing drivers onto their knees, handcuffing them, or placing them into a patrol car.  This custom and practice and these actions are directed, allowed, encouraged, tolerated, condoned, and/or ratified by supervisors at the Beverly Hills Police Department, including sergeants, lieutenants, and captains.

94.    The City of Beverly Hills is responsible for training and monitoring its police officers, and its custom and practice directly led to the individual Defendants' unconstitutional treatment of Plaintiff.  Defendant City of Beverly Hills—through their administrators and policy makers—failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, manage, and discipline the individual Defendants, with deliberate indifference to Plaintiffs' constitutional rights, which were thereby violated as described above.

95.    The unconstitutional actions and/or omissions of Defendants, as described above, were approved, tolerated and/or ratified by policy-making officers for the City

21

of Beverly Hills. Plaintiff is informed and believes, and thereon alleges, the details of this incident have been revealed to the authorized final policy makers within the City of Beverly Hills and that such policymakers have direct knowledge of the fact that Plaintiff was unlawfully injured by the events described above. Notwithstanding this knowledge, the authorized policy makers within the City of Beverly Hills have approved of the conduct and decisions of individual Defendants in this matter, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, that resulted in Plaintiff's injuries. By so doing, the authorized policymakers within the City of Beverly Hills have shown affirmative agreement with individual Defendants' actions, and have ratified the unconstitutional acts of the individual Defendants.

96.     The aforementioned customs, policies, practices, and procedures, the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline, as well as the unconstitutional orders, approvals, ratification and toleration of wrongful conduct of Defendant City of Beverly Hills, were a moving force and/or a proximate cause of the deprivations of Plaintiff's clearly established and well-settled constitutional rights in violation of 42 USC §1983, as more fully set forth above.

97.     Defendant City of Beverly Hills and the individual Defendants subjected Plaintiff to their wrongful conduct, depriving Plaintiff of rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Plaintiff and others would be violated by their acts and/or omissions.

98.     As a direct and proximate result of the unconstitutional actions, omissions, customs, policies, practices, and procedures of Defendant City of Beverly Hills, as described above, Plaintiff sustained serious and permanent injuries and are entitled to damages, penalties, costs, and attorneys' fees as set forth above, and punitive damages against individual Defendants, in their individual capacities. Plaintiff is also entitled to injunctive relief to prevent Defendant City of Beverly Hills from continuing its unlawful policy.

EXHIBIT A
[PROPOSED] FIRST AMENDED COMPLAINT

## **VI. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment in favor of Plaintiff and against each Defendant on all counts, and for actual damages and all other damages that may be allowed under state and federal law to Plaintiff; for punitive damages in the amount of $500,000 each against Officer Falossi, Sergeant Keenaghan and Sergeant Orth, and $250,000 against each remaining individual Defendant; for costs and reasonable attorneys' fees; for pre- and post-judgment interest as permitted by law; injunctive relief; and such other and further relief as the Court may deem just and appropriate.

DATED: August 24, 2021

By:   _Morgan Ricketts_
           Morgan Ricketts
           Attorney for Plaintiff Ashley Blackmon

**EXHIBIT A**
[PROPOSED] FIRST AMENDED COMPLAINT

# VII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

DATED: August 24, 2021

By: *Morgan Ricketts*
Morgan Ricketts
Attorney for Plaintiff Ashley Blackmon