Jeanne L. Tollison, Esq. SBN 238970
KOLAR & ASSOCIATES,
A LAW CORPORATION
12241 Newport Avenue
Santa Ana, California 92705
Tel    :    (714) 544-0041
Fax    :    (714) 544-0051
jeanne@kolarandassociates.com

Attorneys for Defendants CITY OF BEVERLY HILLS, a public
entity and SERGEANT KEVIN ORTH, SERGEANT JAMES
KEENAGHAN, OFFICER ADAM FALOSSI, OFFICER
STEPHEN COMP, OFFICER JONATHAN DE LA CRUZ and
OFFICER MICHAEL DOWNS, as employees of the CITY OF
BEVERLY HILLS, a public entity

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASHLEY BLACKMON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BEVERLY HILLS;<br>BEVERLY HILLS POLICE<br>SERGEANT KEVIN ORTH, JAMES<br>KEENAGHAN, BEVERLY HILLS<br>POLICE OFFICER ADAM FALOSSI<br>(#04678), BEVERLY HILLS POLICE<br>OFFICER STEPHEN COMP,<br>BEVERLY HILLS POLICE OFFICER<br>JONATHAN DE LA CRUZ,<br>BEVERLY HILLS POLICE OFFICER<br>MICHAEL DOWNS, all sued in their<br>individual capacities; and DOES 1-10,<br>inclusive;<br><br>Defendants. | CASE NO.: 2:21-cv-08381 AB (AFMx)<br><br>BEFORE THE HONORABLE ANDRE BIROTTE, JR. COURTROOM 7B<br><br>**DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**<br><br>[*Filed Concurrently with Memorandum of Points and Authorities and Supporting Evidence*]<br><br>HEARING DATES PENDING:<br><br>Type:  Motion for Summary Judgment<br>Date:  June 16, 2023<br>Time:  10:00 a.m. Ctrm:  7B<br><br>Type:  Final Pre-Trial Conference<br>Date:  September 15, 2023<br>Time:  11:00 a.m. Ctrm:  7B<br><br>Type:  Trial<br>Date:  October 3, 2023<br>Time:  8:30 a.m. Ctrm:  7B |

Defendants CITY OF BEVERLY HILLS, a public entity and SERGEANT KEVIN ORTH, SERGEANT JAMES KEENAGHAN, OFFICER ADAM FALOSSI, OFFICER STEPHEN COMP, OFFICER JONATHAN DE LA CRUZ and OFFICER MICHAEL DOWNS, as employees of the CITY OF BEVERLY HILLS, a public entity submit the following statement of uncontroverted facts and conclusions of law in accordance with Local Rule 56-1.

## UNCONTROVERTED FACTS

| Undisputed Fact | Evidence |
|---|---|
| 1. On February 9, 2020 at approximately 9:51 a.m., Plaintiff Ashley Blackmon was driving through the City of Beverly Hills on La Cienega Blvd. The vehicle Plaintiff was driving went through the intersection of La Cienega Blvd. and Gregory Way, which was equipped with an Automated License Plate Reader (ALPR). | Exhibit A - Third Amended Complaint (TAC), ¶¶27, 29. |
| 2. The ALPR registered the vehicle Plaintiff was driving as a stolen vehicle and dispatch with the BHPD broadcasted this information and that the vehicle was traveling north on La Cienega. | Exhibit A – TAC ¶30. |
| 3. The vehicle Plaintiff was driving at the time had license plate #8HCW46, which is the same license plate number associated with the stolen vehicle. | Exhibit A – TAC ¶29. |

| Undisputed Fact | Evidence |
|---|---|
| 4. Officers Adam Falossi and Stephen Comp were nearby at the intersection of La Cienega and Wilshire Blvd. when they heard the radio call and they then observed the Toyota Rav4 with the license plate #8HCW46. | Falossi Decl. ¶ 5; Comp Decl. ¶6; Exhibit K – Comp Patrol Vehicle Video at 0:20[1]; Exhibit W- Dispatch Radio Audio Recording at 00:15-00:25; Exhibit B – Transcript of Dispatch Audio, 2:3-14. |
| 5. The intersection of La Cienega and Wilshire Blvd. is a major intersection in the direct path of northbound ALPR cameras. | Comp Decl. ¶6. |
| 6. Officers Falossi and Comp were not actively searching for suspects. | Comp Decl. ¶6. |
| 7. Officer Falossi begun following the subject vehicle, advised dispatch that Officer Comp was behind him, asked for an additional unit, a sergeant, and an airship. | Falossi ¶ Decl.   5; Comp Decl. ¶7 Exhibit K – Patrol Vehicle Video at 0:20-2:57; Exhibit V – Falossi Patrol Vehicle Video at 11:50-12:45; Exhibit W- Dispatch Radio Audio Recording at 00:26-00:49; Exhibit B – Transcript of Dispatch Audio, 2:19-21. |
| 8. Officer Falossi confirmed the license plate on Plaintiff's vehicle matched the license plate of the vehicle that was reported stolen. | Falossi Decl. ¶ 6; Exhibit W- Dispatch Radio Audio Recording at 00:50-00:55; Exhibit B – Transcript of Dispatch Audio, 2:3-9. |
| 9. He also reported to dispatch that it appeared to be occupied by one male. | Falossi Decl. ¶ 6; Exhibit W- Dispatch Radio Audio Recording at 01:5-01:43; |

---

[1] All time references are to the time elapsed on the video.

| Undisputed Fact | Evidence |
|---|---|
| | Exhibit B – Transcript of Dispatch Audio, 2:24-3:1. |
| 10. Officer Falossi also noted the vehicle reported as stolen was gray where the vehicle he was following was black. | Falossi Decl. ¶6; Exhibit W- Dispatch Radio Audio Recording at 01:48-01:54; Exhibit B – Transcript of Dispatch Audio, 3:3-8. |
| 11. Officer Falossi mentioned to dispatch the color discrepancy and there was a possibility of a "plate swap." | Falossi Decl. ¶7; Exhibit W- Dispatch Radio Audio Recording at 01:48-01:54; |
| 12. A plate swap occurs when the license plate of a stolen vehicle is placed on another vehicle and vice versa. | Exhibit A – TAC ¶30. |
| 13. However, it is not uncommon for a color to be mistakenly entered when a vehicle is reported stolen nor is it not uncommon the color of the vehicle being altered after a vehicle is stolen. | Falossi Decl. ¶7. |

| Undisputed Fact | Evidence |
|---|---|
| 14. Although the colors of the vehicles did not match, the colors were both darker colors and the stolen vehicle and Plaintiff's vehicle were similar makes, model, and years (2018 vs. 2019). | Falossi Decl. ¶9. |
| 15. Once Officer Falossi confirmed he had an additional unit present (Officer Downs and Officer De La Cruz), he initiated the high-risk traffic stop. | Falossi Decl. ¶10; Comp Decl. ¶7; Exhibit K – Comp Patrol Vehicle Video at 02:44-02:46; Exhibit L – Downs Patrol Vehicle Video at 01:44-2:00; Exhibit W- Dispatch Radio Audio Recording at 02:28-02:33. |
| 16. Officers are trained that stopping persons driving motor vehicles can be one of the most dangerous duties a patrol officer can perform. | Trejo Decl. ¶9; Comp Decl. ¶5; Falossi Decl. ¶4; De La Cruz Decl. ¶5; Downs Decl. ¶4. |
| 17. Conducting a traffic stop on a stolen vehicle or a potentially stolen vehicle is considered a high-risk stop because stolen vehicles are often used in other serious crimes. | Orth Decl. ¶5; Keenaghan Decl. ¶4 Trejo Decl. ¶9; Comp Decl. ¶5; Falossi ¶4; De La Cruz Decl. ¶5; Downs Decl. ¶4; Deposition of Adam Falossi, 110:14-25 attached to Compendium of Exhibits as Exhibit Y. |

| Undisputed Fact | Evidence |
|---|---|
| 18. A high-risk traffic stop is a stop that has unknown risks, which are present in every traffic stop, in conjunction with a known risk, such as an occupant being armed or the vehicle was involved in a violent crime or felony. | Orth Decl. ¶5; Keenaghan Decl. ¶4. |
| 19. High-risk stops are made when an officer has reason to believe that one or more of the occupants has committed a felony or is armed. | Trejo Decl. ¶9; Comp Decl. ¶5; Decl. Falossi ¶4; De La Cruz Decl. ¶5; Downs Decl. ¶4. |
| 20. BHPD is aware of instances where the high-risk procedures were not used with a stolen vehicle that resulted in injury and deaths which could have been prevented had the high-risk procedure been used. | Deposition of Giovanni Trejo, Vol. 3, 210:12-211:19,271:25-272:18, attached to Compendium of Exhibits as Exhibit AA. |
| 21. BHPD officers are trained that each traffic stop, including each high-risk stop, may present different circumstances and the general procedures may be adapted depending on what the officer or officers are facing during the stop | Trejo Decl. ¶10; Deposition of Trejo, Vol. 3, 201:15-24, attached to Compendium of Exhibits as Exhibit AA; Deposition of Adam Falossi, 70:4-20, attached to Compendium of Exhibits as Exhibit Y. |

| Undisputed Fact | Evidence |
|---|---|
| 22. The high-risk stop procedure generally involves an officer initiating a traffic stop with additional units. | Deposition of Giovanni Trejo, Vol. 3, 157:7-158:3, attached to Compendium of Exhibits as Exhibit AA; Deposition of Kevin Orth 102:3-15, attached to Compendium of Exhibits as Exhibit Z; Trejo Decl. ¶10; Deposition of Adam Falossi, 79:17-81:14 attached to Compendium of Exhibits as Exhibit Y. |
| 23. The officers typically take a position of cover and may have their primary weapon unholstered and it may be pointed in some direction towards the vehicle. | Deposition of Giovanni Trejo, Vol. 3, 158:4-13, attached to Compendium of Exhibits as Exhibit AA; Trejo Decl. ¶10. |
| 24. The officers may also point their primary weapon in the direction of the driver or vehicle at a low-ready position. | Deposition of Giovanni Trejo, Vol. 3, 158:4-19, attached to Compendium of Exhibits as Exhibit AA; Deposition of Adam Falossi 95:9-21, attached to Compendium of Exhibits as Exhibit Y; |

| Undisputed Fact | Evidence |
|---|---|
| 25. The officers may also instruct the driver to throw their keys out the window, direct the driver and any occupants to exit, have the person who exited the vehicle face away from the officers and walk backwards towards the officers to be handcuffed either in a kneeled position or a prone position, and placed in back of a patrol vehicle while the officers conduct their investigation. | Deposition of Giovanni Trejo, Vol. 3, 158:23-160:14, attached to Compendium of Exhibits as Exhibit AA; Deposition of Kevin Orth, 102:17-104:9, attached to Compendium of Exhibits as Exhibit Z; Deposition of Adam Falossi, 79:17-81:14 attached to Compendium of Exhibits as Exhibit Y. |
| 26. It is generally accepted that certain circumstances justify the use of the high-risk stop procedure. These include stolen vehicles, vehicles involved in a violent crime, such as robbery, burglary, assault with a deadly weapon, rape or a vehicle that is feeling or evading law enforcement. | Deposition of Kevin Orth 57:2-15, attached to Compendium of Exhibits as Exhibit Z. |
| 27. Officers are trained in the Academy that a suspected stolen vehicle justifies a high-risk stop. | Deposition of Kevin Orth 109:11-14; Orth Decl. ¶5; Deposition of Adam Falossi, 76:12-21. |
| 28. BHPD officers are trained that the use of the high-risk stop procedure is to maintain control of a situation and is used for the safety of the public, the suspect and the officers. | Trejo Decl. ¶11; Orth Decl. ¶5; Keenaghan Decl. ¶4. |

| Undisputed Fact | Evidence |
|---|---|
| 29. Officer Falossi initiated the high-risk stop after confirming the license plate of the Rav4 matched the license plate of the stolen vehicle. | Falossi Decl. ¶6; Exhibit W- Dispatch Radio Audio Recording at 00:50-00:55; Exhibit B – Transcript of Dispatch Audio, 2:3-9 and 3:3-8. |
| 30. Officer Falossi believed that the Rav4 was the stolen vehicle and based upon his training and experienced, determined a high-risk stop procedure should be used given the circumstances. | Falossi Decl. ¶9; Deposition of Adam Falossi, 105:7-13 attached to Compendium of Exhibits as Exhibit Y. |
| 31. Officer Falossi then activated his lights and once the Rav4 pulled over, exited his patrol vehicle, and stood in his open doorway, drew his handgun, and oriented it towards the Rav4 and gave instructions to Plaintiff. Although his handgun was pointed in the direction of Plaintiff and the vehicle, he kept the muzzle of his handgun slightly downward. | Falossi Decl. ¶10; Exhibit K – Comp Patrol Vehicle Video at 02:38-03:03; Exhibit O – Comp (Part 1) BWC Video at 00:16-01:50[2]; Exhibit P – Downs BWC Video at 01:20-01:41 |
| 32. At no time did he place his finger on the trigger of the handgun. | Falossi Decl. ¶10; Exhibit O – Comp (Part 1) BWC Video at 00:16-3:10. |
| 33. His handgun may have been raised slightly when Plaintiff stepped out of the vehicle, but it was kept in a low-ready position. | Falossi Decl. ¶10; Exhibit O – Comp (Part 1) BWC Video at 01:10-01:50; Exhibit P – Downs BWC Video at 01:20-01:41. |

[2] The BWCs do not have sound the first 30 seconds.

| Undisputed Fact | Evidence |
|---|---|
| 34. The low-ready position is when an officer unholsters their weapon, without their finger on the trigger, the weapon is positioned below the officer's line of sight to allow an unobstructed view of the scene and the officer does not have his sights aligned on target. | Falossi Decl. ¶10. |
| 35. Plaintiff was instructed to throw her keys out the window, which she was unable to do. | Deposition of Adam Falossi, 119;17-19;   141:11-142:10   attached   to Compendium of Exhibits as Exhibit Y. Exhibit N - De La Cruz BWC at 0:50-1:17. |
| 36. After a few seconds, Officer Falossi instructed Plaintiff to get out of the vehicle and she complied. | Deposition of Adam Falossi, 141:11-142:10 attached to Compendium of Exhibits as Exhibit Y; Exhibit N - De La Cruz BWC at 0:50-1:17; Exhibit O – Comp (Part 1) BWC Video at 01:47-02:04; Exhibit D – Transcript of Comp BWC (Part 1) 3:1-21; Exhibit P – Downs BWC Video at 01:20-01:41. |

| Undisputed Fact | Evidence |
|---|---|
| 37. Plaintiff faced away from the officers and held her hands up as instructed. | Deposition of Adam Falossi, 121:8-14 attached to Compendium of Exhibits as Exhibit Y; Exhibit O – Comp (Part 1) BWC Video at 02:04-3:03; Exhibit P – Downs BWC Video at 01:41-02:40. |
| 38. She then walked backwards towards the officers, kneeled on the ground as instructed and handcuffs were placed on her. | Deposition of Adam Falossi, 121:16-122:4 attached to Compendium of Exhibits as Exhibit Y; Exhibit O – Comp (Part 1) BWC Video at 02:04-03:03. |
| 39. As Plaintiff walked backwards, Officer Falossi kept his handgun in a low-ready position. | Exhibit O – Comp (Part 1) BWC Video at 02:04-03:03; Exhibit P – Downs BWC Video at 01:41-02:40. |
| 40. Once Plaintiff was close to Officer Falossi and Officer Comp, Officer Falossi held his handgun in an even lower position and oriented it towards the Rav4, not towards Plaintiff. | Falossi Decl. ¶11; Exhibit O – Comp (Part 1) BWC Video at 02:31-03:07; Exhibit P – Downs BWC Video at 02:18-02:30. |
| 41. At that point, it was unknown if there were additional occupants in the vehicle. | Falossi Decl. ¶11. |

| Undisputed Fact | Evidence |
|---|---|
| 42. While Plaintiff was being handcuffed by Officer Comp, Officer Falossi's weapon was oriented in a downward fashion pointing towards the vehicle. | Exhibit P – Downs BWC Video at 02:35-03:07. |
| 43. Once the stop was initiated, Officer Comp positioned his patrol vehicle to the left of Officer Falossi's vehicle, opened his door and stood in the V of the driver's door, drew his handgun, and assumed a two-handed hold in a low-ready position without his finger on the trigger, and oriented in the general direction of the Rav4 for approximately 1 minute and 22 seconds. | Comp Decl. ¶8; Exhibit O – Comp (Part 1) BWC Video at 00:16-1:42; Exhibit K – Comp Patrol Vehicle Video at 00:16. |
| 44. Officer Comp then lowered his handgun and oriented toward the interior of his patrol vehicle for approximately 11 seconds and then re-established the two-handed position on the handgun and oriented it back in the general direction of the Rav4 in a low-ready position without his finger on the trigger. | Comp Decl. ¶8; Exhibit O – Comp (Part 1) BWC Video at 01:40-01:58. |

| Undisputed Fact | Evidence |
|---|---|
| 45. When Plaintiff started to exit the Rav4, Officer Comp moved around the back of the patrol SUV and stopped behind Officer Falossi. He then assumed a two-handed hold on his handgun and held it towards his torso in a compressed low-ready position. | Comp Decl. ¶9; Exhibit O – Comp (Part 1) BWC Video at 01:58-2:40. |
| 46. Officer Comp did not have his finger on the trigger while the weapon was pointed in a low-ready position towards the vehicle. | Comp Decl. ¶9; Exhibit O – Comp (Part 1) BWC Video at 01:58-2:40. |
| 47. While Plaintiff was walking backwards, Officer Comp kept his handgun in a low-ready position until Plaintiff was in a position for handcuffing. | Comp Decl. ¶9; Exhibit O – Comp (Part 1) BWC Video at 2:40-02:57. |
| 48. Officer Comp holstered his handgun and placed handcuffs on Plaintiff. | Comp Decl. ¶10; Exhibit O – Comp (Part 1) BWC Video at 02:57-03:10. |
| 49. Throughout his interactions with Plaintiff, Officer Comp used clear and concise language in a calm manner to communicate with her. | Comp Decl. ¶10; Exhibit O – Comp (Part 1) BWC Video at 2:40-4:10; Exhibit D – Transcript of Comp BWC (Part 1) 4:6-6:20. |

| Undisputed Fact | Evidence |
|---|---|
| 50. He repeated his instructions and gave examples, such as "like you're praying" to assist Plaintiff to follow directions. | Comp Decl. ¶10; Exhibit O – Comp (Part 1) BWC Video at 02:40-02:57; Exhibit D – Transcript of Comp BWC (Part 1) 4:7-12. |
| 51. He used positive reinforcement and spoke in a considerate tone, by saying "Just like that Ma'am", "Stay Calm" and "Stay just like that Ma'am". | Comp Decl. ¶10; Exhibit O – Comp (Part 1) BWC Video at 02:40-02:57; Exhibit D – Transcript of Comp BWC (Part 1) 4:7-5:1. |
| 52. Officer Comp was polite in his communication, addressing Plaintiff as "Ma'am" and "Miss". | Comp Decl. ¶10; Exhibit O – Comp (Part 1) BWC Video at 2:40-4:10; Exhibit D – Transcript of Comp BWC (Part 1) 4:6-6:20. |
| 53. He used inclusive language like "Here we go" and "Walk backwards with me". | Comp Decl. ¶10; Exhibit O – Comp (Part 1) BWC Video at 03:15-03:26; Exhibit D – Transcript of Comp BWC (Part 1) 4:24-5:12. |
| 54. After Plaintiff was handcuffed, Officer Comp walked her back to the rear of his patrol vehicle, he asked what her name was, used her name in communications and told her everything would be explained to her in a moment. | Comp Decl. ¶11; Exhibit O – Comp (Part 1) BWC Video at 03:26-03:32; Exhibit D – Transcript of Comp BWC (Part 1) 5:9-18. |

| Undisputed Fact | Evidence |
|---|---|
| 55. He asked Plaintiff if she had any weapons on her and whether he could check her pockets to which she nodded yes. | Comp Decl. ¶11; Deposition of Adam Falossi, 169:11-18 attached to Compendium of Exhibits as Exhibit Y; Exhibit O – Comp (Part 1) BWC Video at 03:32-03:46; Exhibit D – Transcript of Comp BWC (Part 1) 5:9-18. |
| 56. Officer Comp reasonably believed she gave consent. | Comp Decl. ¶11. |
| 57. Officer Comp lifted her denim jacket by the bottom slightly to check her waist band for weapons. | Comp Decl. ¶11; Exhibit O – Comp (Part 1) BWC Video at 03:46-03:50. |
| 58. He did not perform a pat-down. | Exhibit O – Comp (Part 1) BWC Video at 03:30-03:50. |
| 59. Officer Comp then escorted her to the back of patrol vehicle and had her sit inside. He again told her everything would be explained in a moment. | Comp Decl. ¶11; Exhibit O – Comp (Part 1) BWC Video at 03:50-04:10; Exhibit J – Transcript of Comp BWC (Part 2) 6:3-20. |
| 60. Officer Downs and Officer De La Cruz heard the radio call concerning a confirmed ALPR hit and responded to the northbound lanes of La Cienega Blvd. near Beverly Blvd. | Downs Decl. ¶5; De La Cruz Decl. ¶6. |

| Undisputed Fact | Evidence |
|---|---|
| 61. Officer Downs and Officer De La Cruz followed behind Officer Falossi and Officer Comp for a few seconds before Officer Falossi activated his emergency lights to signal the driver to pull over. | Downs Decl. ¶5; Exhibit L – Downs Patrol Vehicle Video at 01:46-02:10. |
| 62. Officer Downs does not recall hearing the color of the reported stolen vehicle while he was responding to the scene and reasonably believed that the vehicle being pulled over was a stolen vehicle and the driver was the suspect. | Downs Decl. ¶6. |
| 63. After Plaintiff pulled the Rav4 over, Officer Downs positioned his patrol vehicle to the left and rear of Officer Comp's patrol vehicle and at a slight angle straddling the center median and number one northbound lane on La Cienega. | Downs Decl. ¶8; Exhibit L – Downs Patrol Vehicle Video at 02:10-2:18. |
| 64. His vehicle was approximately 35-40 feet away from Plaintiff's vehicle. | Downs Decl. ¶8; Exhibit L – Downs Patrol Vehicle Video at 02:18. |

| Undisputed Fact | Evidence |
|---|---|
| 65. Officer Downs exited his patrol vehicle and positioned himself in the V of the door, frame and drew his handgun to a one-handed ready position with the handgun oriented in the general direction of the Rav4 for a few seconds. | Downs Decl. ¶9; Exhibit P – Downs BWC Video at 00:02-00:36. |
| 66. He then re-holstered his handgun, put on black latex gloves, drew his handgun and assumed a twohanded position with his handgun pointed downward and to the left of the Rav4. | Downs Decl. ¶9; Exhibit P – Downs BWC Video at 00:36-02:36. |
| 67. He kept his handgun oriented in this position when Plaintiff exited the vehicle and as she walked backwards towards Officer Comp and Officer Falossi. | Downs Decl. ¶9; Exhibit P – Downs BWC Video at 00:36-02:36; Exhibit M – Orth Patrol Vehicle Video at 03:40-03:55. |
| 68. He held this position until the other officers cleared the vehicle, making sure there were no other occupants. | Exhibit P – Downs BWC Video at 02:36-4:17. Exhibit M – Orth Patrol Vehicle Video at 03:40-05:42. |
| 69. At no time did Officer Downs track Plaintiff with his weapon nor did he point his handgun directly at her. | Downs Decl. ¶11; Exhibit P – Downs BWC Video at 00:36-4:17; Exhibit M – Orth Patrol Vehicle Video at 03:40-03:55. |
| 70. Officer Downs kept his finger off the trigger, in a low-ready position oriented towards the Rav4. | Downs Decl. ¶11; Exhibit P – Downs BWC Video at 00:36-4:17. |

| Undisputed Fact | Evidence |
| --- | --- |
| 71.  Officer De La Cruz did not recall hearing any discussions on the radio concerning the color of the reported stolen vehicle while he was responding to the scene. | De La Cruz Decl. ¶7. |
| 72.  When he arrived at the scene, Officer De La Cruz had the reasonable belief that the vehicle which was pulled over, a black Toyota Rav4, was a stolen vehicle and the driver of that vehicle was the suspect. | De La Cruz Decl. ¶7. |
| 73.  Officer De La Cruz did not know the race of the driver until she stepped out of the vehicle after the high-risk stop was initiated. | De La Cruz Decl. ¶7. |
| 74.  When he arrived at the scene, Officer De La Cruz exited the vehicle, walked behind Officer Comp's vehicle over to Officer Falossi's vehicle. | De La Cruz Decl. ¶8; Exhibit N – De La Cruz BWC Video at 00:15-00:24. |
| 75.  Officer De La Cruz opened the passenger door of Officer Falossi's vehicle and positioned himself in the V of the door. | De La Cruz Decl. ¶8; Exhibit N – De La Cruz BWC Video at 00:24-00:27. |

| Undisputed Fact | Evidence |
|---|---|
| 76. Officer De La Cruz unholstered his handgun and oriented toward the general area of the passenger side of the Rav4 while Officer Falossi gave instructions to Plaintiff. | De La Cruz Decl. ¶9; Exhibit N – De La Cruz BWC Video at 00:27-02:35. |
| 77. He never pointed his handgun at Plaintiff nor did he ever point his handgun towards the driver's side of the vehicle. | De La Cruz Decl. ¶9; Exhibit N – De La Cruz BWC Video at 00:27-04:15. |
| 78. Officer De La Cruz never tracked Plaintiff with his handgun. | De La Cruz Decl. ¶9; Exhibit N – De La Cruz BWC Video at 00:27-04:15. |
| 79. Officer De La Cruz kept his handgun in a low-ready position and at no time did he have his finger on the trigger. | De La Cruz Decl. ¶9; Exhibit N – De La Cruz BWC Video at 00:27-04:15. |
| 80. Officer De La Cruz maintained this position until Officer Comp, Officer Falossi and himself approached the vehicle in order to clear the vehicle. | De La Cruz Decl. ¶9; Exhibit N – De La Cruz BWC Video at 00:27-04:26. |
| 81. Sergeant Kevin Orth and Sergeant James Keenaghan arrived at the scene at Field Sergeants. | Orth Decl. ¶6; Keenaghan Decl. ¶5. |

| Undisputed Fact | Evidence |
|---|---|
| 82. As the Field Sergeants, their role was to provide supervision to the officers who were investigating the potentially stolen vehicle and to provide oversight, observe the investigation and lend assistance as needed, be present in case anyone asked to speak to a supervisor and answer any questions that may come up. (Orth Decl. ¶6; Keenaghan Decl. ¶5). | Orth Decl. ¶6; Keenaghan Decl. ¶5 |
| 83. Sergeant Kevin Orth and Sergeant James Keenaghan arrived at the scene as Plaintiff was walking backwards towards Officers Comp and Falossi. | Orth Decl. ¶8; Keenaghan Decl. ¶7; Exhibit M – Orth Patrol Vehicle Video at 03:40-03:55; Exhibit R – Keenaghan BWC Video at 00:01-00:30; Exhibit P – Downs BWC Video at 02:34-3:00. |
| 84. Sergeant Orth and Sergeant Keenaghan were under the reasonable belief that the vehicle was stolen and Plaintiff at that time was the suspect. | Orth Decl. ¶8; Keenaghan Decl. ¶7. |
| 85. Sergeant Keenaghan approached the open door of Officer Comp's patrol vehicle and stood in the V of the door while Plaintiff was walking backwards towards Officers Comp and Falossi to be handcuffed. | Keenaghan Decl. ¶8; Exhibit M – Orth Patrol Vehicle Video at 03:40-04:50. |

| Undisputed Fact | Evidence |
|---|---|
| 86. Sergeant Keenaghan never unholstered his weapon. | Keenaghan Decl. ¶9.; Exhibit P – Downs BWC Video at 02:34-3:18; Exhibit M – Orth Patrol Vehicle Video at 03:40-04:50.; Exhibit R – Keenaghan BWC Video at 00:01-00:30. |
| 87. When Sergeant Orth initially observed Officer Falossi, he had his handgun in a low-ready position oriented towards the ground and the subject vehicle as Plaintiff was walking backwards toward him. | Orth Decl. ¶9; Exhibit P – Downs BWC Video at 02:30. |
| 88. It also appeared to him that Officer Comp, who was next to Officer Falossi also had his weapon in a low-ready position. (Orth Decl. ¶9) | Orth Decl. ¶9; Exhibit P – Downs BWC Video at 02:30. |
| 89. It appeared to Sergeant Orth that Officer Downs appeared to have his weapon in a low-ready position oriented towards the vehicle and Plaintiff was not near her vehicle. | Orth Decl. ¶10; Exhibit M – Orth Patrol Vehicle Video at 3:45. |
| 90. Sergeant Orth approached the passenger side of Officer Falossi's patrol vehicle where Officer De La Cruz was positioned and unholstered his weapon. | Orth Decl. ¶11; Exhibit P – Downs BWC Video at 02:30. |

| Undisputed Fact | Evidence |
|---|---|
| 91. Sergeant Orth observed Officer De La Cruz holding held his handgun in low-ready position oriented towards the passenger side of the Rav4. | Orth Decl. ¶11. |
| 92. Sergeant Orth held his handgun in a similar fashion, pointing it towards the vehicle in a low-ready position until the officers were able to clear the vehicle. | Orth Decl. ¶11. |
| 93. Within less than a minute after Sergeant Orth and Sergeant Keenaghan's arrival, Plaintiff was placed in handcuffs. | Exhibit M – Orth Patrol Vehicle Video at 3:45-4:20; Exhibit R – Keenaghan BWC Video at 00:00-00:20. |
| 94. During the time Plaintiff was walking backwards, none of the officers had their weapons pointed directly at her with sights aligned. | Falossi Decl. ¶10; De La Cruz Decl. ¶9; Downs Decl. ¶11; Comp Decl. ¶9; Orth Decl. ¶9,10,11. |
| 95. All officers kept their fingers off the trigger and had their handguns oriented in a low-ready position. | Falossi Decl. ¶10; De La Cruz Decl. ¶9; Downs Decl. ¶11; Comp Decl. ¶9. |
| 96. After Plaintiff was handcuffed, she was placed in the back of the patrol vehicle, Sergeant Keenaghan stood by her with the door open and assured her that she would be fine. | Keenaghan Decl. ¶9; Exhibit R – Keenaghan BWC Video at 01:15-2:10; Exhibit G – Transcript of Keenaghan BWC at 3:20-4:3 |

| Undisputed Fact | Evidence |
|---|---|
| 97. At no time once handcuffs were placed on Plaintiff were there any handguns oriented towards her. | Exhibit O – Comp (Part 1) BWC Video at 3:00-6:05;  Exhibit P – Downs BWC Video at 2:46-3:10. |
| 98. Officers Falossi, Comp and De La Cruz then approached the Rav4 with their handguns in a low-ready position and cleared the vehicle, meaning they confirmed no other occupants were in the vehicle. | Falossi Decl. ¶12; De La Cruz Decl. ¶9; Downs Decl. ¶9; Comp ¶11; Exhibit O – Comp (Part 1) BWC Video at 04:10-04:30; Exhibit P – Downs BWC Video at 04:05-04:16; Exhibit N – De La Cruz BWC Video at 4:10-4:30 |
| 99. Within approximately two minutes after handcuffs were placed on Plaintiff, the officers determined that her license plate was swapped with the license plate of a stolen vehicle and the handcuffs were removed. | Orth Decl. ¶11; Keenaghan Decl. ¶10; Exhibit O – Comp (Part 1) BWC Video at Comp BWC 3:05-6:05. Exhibit R – Keenaghan BWC Video at 1:04-2:40. |
| 100. Although Plaintiff complied with the instructions given by the officers, full compliance with orders would be after control of the situation is established. | De La Cruz Decl. ¶10; Comp Decl. ¶12; Falossi Decl. ¶15; Downs Decl. ¶10. |
| 101. Each order was given in steps to determine compliance until the suspect is placed in handcuffs. | De La Cruz Decl. ¶10; Comp Decl. ¶12; Falossi Decl. ¶15; Downs Decl. ¶10. |

| Undisputed Fact | Evidence |
|---|---|
| 102. Up until Plaintiff was placed in handcuffs and the vehicle was cleared, the situation involving Plaintiff was not under control. | De La Cruz Decl. ¶10; Comp Decl. ¶12; Falossi Decl. ¶15; Downs Decl. ¶10. |
| 103. Up until the time it was determined Plaintiff's license plates had been swapped, Plaintiff was considered a suspect involved in a vehicle theft which resulted in a high-risk traffic stop. | De La Cruz Decl. ¶10; Comp Decl. ¶13; Falossi Decl. ¶15; Downs Decl. ¶10. |
| 104. Officer Falossi and Sergeant Orth attempted to explain the rational for the high-risk stop. | Deposition of Adam Falossi, 129:8-22; 132:21-133:8 attached to Compendium of Exhibits as Exhibit Y; Exhibit S – Falossi (Part 1) BWC Video at 00:00-3:36; Exhibit H – Transcript of Falossi BWC (Part 1) 2:1-8:12; Exhibit Q – Orth BWC Video at 03:33-15:24; Exhibit F – Transcript of Orth BWC 3:1-23:14; Exhibit T – Falossi (Part 2) BWC Video at 00:30-04:19; Exhibit I – Transcript of Falossi BWC (Part 2) 2:20-7:7. |

| Undisputed Fact | Evidence |
|---|---|
| 105. As Officer Falossi tried to explain the rationale, Plaintiff complained that the officers had "pulled" their guns on her and that she was traumatized by that, to which Officer Falossi said "...we're very sorry about that," to which Plaintiff replied, "No, you're not." | Exhibit S – Falossi (Part 1) BWC Video at 02:20 -02:33; Exhibit H – Transcript of Falossi BWC (Part 1) 4:14-22. |
| 106. Plaintiff then accused the officers of being "racist." | Exhibit T – Falossi (Part 2) BWC Video at 04:04-04:19; Exhibit I – Transcript of Falossi BWC (Part 2) 2:20-7:7.<br>Exhibit Q – Orth BWC Video at 14:30-15:24; Exhibit F – Transcript of Orth BWC 22:22-23:14. |
| 107. From the time Plaintiff was signaled to pull over until the stop was concluded was approximately 17 minutes, the majority of which was explaining to Plaintiff the justification for the stop and why she was pulled over. | Exhibit K – Comp Patrol Vehicle Video at 2:50-15:20; Exhibit L – Downs Patrol Vehicle Video at 02:05-16:30; Exhibit M – Orth Patrol Vehicle Video at 3:30-18:53; Exhibit S – Falossi (Part 1) BWC Video at 00:00-3:36; Exhibit T- Falossi (Part 2) BWC Video at 00:30-04:19; Exhibit Q – Orth BWC Video at 03:33-15:24; Exhibit V– Falossi Patrol Vehicle Video at 26:28-38:46<br><br>. |

| Undisputed Fact | Evidence |
| --- | --- |
| 108. From the time Plaintiff is pulled over to the time she exits the vehicle is approximately one minute and 40 seconds. | Exhibit K – Comp Patrol Vehicle Video at 2:55-4:40 Exhibit L – Downs Patrol Vehicle Video at 02:05-3:54; Exhibit V– Falossi Patrol Vehicle Video at 26:30-28:23. |
| 109. From the time Plaintiff exits her vehicle to the time handcuffs are placed on her is approximately one minute. | Exhibit O – Comp (Part 1) BWC Video at Comp BWC 1:58-3:05. |
| 110. Plaintiff spent approximately 3 minutes in handcuffs. | Exhibit O – Comp (Part 1) BWC Video at Comp BWC 3:05-6:05. |
| 111. None of the officers used any derogatory terms towards Plaintiff nor did any of them say anything to her that she believes was offensive. | Deposition of Plaintiff, 88:13-21, attached to Compendium of Exhibits as Exhibit BB. |
| 112. None of the officers verbally threatened to shoot Plaintiff. | Deposition of Plaintiff 121:13-23; 122:15-17; 123:9-17; 124:14-24; 125:12-15, attached to Compendium of Exhibits as Exhibit BB. |
| 113. At no time did the officers comment about Plaintiff's race. | Deposition of Plaintiff, 88:13-21, attached to Compendium of Exhibits as Exhibit BB; Downs Decl. ¶ 12; Falossi Decl. ¶17; Declaration of Stephen Comp Decl. ¶15; De La Cruz Decl. ¶12; Orth Decl. ¶13; Keenaghan Decl. ¶11. |

| Undisputed Fact | Evidence |
|---|---|
| 114. None of the officers had the specific intent to cause Plaintiff harm or violate her rights. | Deposition of Plaintiff 121:16-23; 122:18-123:1; 124:1-6; 124:14-24; 125:16-24, attached to Compendium of Exhibits as Exhibit BB; Downs Decl. ¶ 12; Falossi Decl. ¶17; Declaration of Stephen Comp Decl. ¶15; De La Cruz Decl. ¶12; Orth Decl. ¶13; Keenaghan Decl. ¶11. |
| 115. All officers had received training prior to this incident that addressed racial bias/profiling. | Comp Decl. ¶4; Declaration of Adam Falossi Decl. ¶3; Downs Decl. ¶3; De La Cruz Decl. ¶4; Orth Decl. ¶4; Keenaghan Decl. ¶3. |
| 116. The City only employs sworn police officers who have attended and graduated from a police academy certified by the California Commission on Peace Officer Standards and Training ("P.O.S.T."). P.O.S.T. certified academies currently require a minimum of 664 hours of instruction; however, most P.O.S.T. academy curriculums include approximately 800-1040 hours of instruction. | Trejo Decl. ¶3. |

| Undisputed Fact | Evidence |
|---|---|
| 117. Numerous topics are instructed during the academy including the constitutional rights and protections of people and property, search and seizure, laws of arrest, reasonable suspicion, probable cause, use of force, and racial bias training. | Trejo Decl. ¶3. |
| 118. Currently P.O.S.T. requires a minimum of twelve (12) hours of training on the Laws of Arrest and a minimum of four (4) hours of Arrest and Control training every two (2) years. The Laws of Arrest curriculum includes instruction on peace officers' responsibilities in regard to conducting arrests within the constitutional rights and protections of others. The training emphasizes the differences between consensual encounters, detentions based on reasonable suspicion, and lawful arrests including warrantless arrests when probable cause exists. | Trejo Decl. ¶4. |

| Undisputed Fact | Evidence |
| --- | --- |
| 119. P.O.S.T. also requires a minimum of twenty-six (26) hours of training on Principled Policing. The Principled Policing curriculum includes instruction on the topics of implicit and explicit bias, procedural justice, legitimacy and historical events. The curriculum is designed to help officers recognize the existence of implicit bias and how it can influence decision-making. | Trejo Decl. ¶4. |
| 120. After graduating from the academy, a new police recruit hired by the City goes through a two week orientation followed by an intensive twenty-one week P.O.S.T. approved Field Training Program ("Field Training"). During Field Training, the new recruit is assigned to work with multiple Field Training Officers ("FTO") on a rotating basis. | Trejo Decl. ¶5. |

| Undisputed Fact | Evidence |
|---|---|
| 121. During field training, the new recruits are assigned to patrol duties and work as a partner officer with their FTO. The police recruit, along with their assigned FTOs, handles calls for service, respond to emergencies, investigate and document crime and incident reports, interview witnesses and suspects, and effect arrests. They are taught how to work effectively as an independent patrol officer in preparation to work without a partner officer. | Trejo Decl. ¶5. |
| 122. The FTOs closely evaluate and document the recruits' training progress, including the recruits' understanding and application of the laws of arrest. During the twenty-one-week program the FTOs regularly meet with the field training sergeants and other FTOs to review and discuss the recruit's progress. | Trejo Decl. ¶5. |

| Undisputed Fact | Evidence |
|---|---|
| 123. At the completion of the Field Training program, the recruit must demonstrate their proficiency and readiness to work independently by completing a one-week shadow phase as well as passing the final Field Training evaluation and the Field Training exit interview. | Trejo Decl. ¶5. |
| 124. Once the recruit successfully completes the Field Training program, the trainee is assigned to a patrol shift, which he or she works independently. The recruit will continue to work in a patrol capacity, handle calls for service, conduct criminal investigations, conduct traffic enforcement, engage in community-oriented policing, effect arrests, and handle other patrol related duties as assigned. They are overseen by patrol sergeants who monitor and evaluate their performance, review and critique their police reports, and review and approve their arrests. | Trejo Decl. ¶6. |

| Undisputed Fact | Evidence |
|---|---|
| 125. In addition to the academy and field training, P.O.S.T. requires all police officers to attend a minimum of twenty-four (24) hours of P.O.S.T. approved Continuing Professional Training (CPT) every two years. | Trejo Decl. ¶7. |
| 126. The Department's officers meet this training requirement through various venues such as offsite training, i.e., training provided by other agencies or professional training programs, or in-house training, i.e., training that is provided in-house by the City's officers who have received P.O.S.T. certifications in specialty areas. A wide range of topics are covered during this training, including arrest and control, first-aid, principled policing, and other relevant training topics. | Trejo Decl. ¶7. |

| Undisputed Fact | Evidence |
|---|---|
| 127. The City has written policies in place regarding police officer authority to use force against another. These policies are taught and demonstrated frequently during the field training program and revisited periodically throughout an officer's career, be it through formal training, informal training, and/or discussions with the officer's supervisors. | Trejo Decl. ¶ 8; Exhibit X – Use of Force policy. |
| 128. The City's force policies reinforce that officers shall observe and comply with an individual's rights as established under the United States and California Constitutions. The force used should be determined by facts and the totality of the circumstances known to the officer at the time and should be judged from the perspective of a reasonable officer. | Trejo Decl. ¶8. |

## CONCLUSIONS OF LAW

Based on the foregoing undisputed facts, which have been construed in the light most favorable to Plaintiff ASHLEY BLACKMON, the Court makes the following conclusions of law:

1.     Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.

1  Fed. Rule Civ. Proc. 56; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970);

2  *Fortyune v. American Multi-Cinema, Inc.*, 364 F.3d 1075, 1080 (9th Cir. 2004).

3       2.      The "mere existence of some alleged factual dispute between the parties

4  will not defeat an otherwise properly supported motion for summary judgment; the

5  requirement is that there be no genuine issue of material fact." *Anderson v. Liberty*

6  *Lobby, Inc.,* 477 U.S. 242, 247-48 (1986); *United States v. Kapp*, 564 F.3d 1103,

7  1114 (9th Cir. 2009).

8       3.      A fact is "material" only if it might affect the outcome of the suit under

9  the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

10      4.      Mere negligence, or even gross negligence, is not sufficient to support

11  a claim for violation of civil rights under 42 U.S.C. section 1983. *Daniels v.*

12  *Williams*, 474 U.S. 327, 332 (1986).

13      5.      Based on the undisputed evidence, Defendants are entitled to judgment

14  in their favor on Plaintiffs' claims.

15      6.      The officers used objectively reasonable force when they responded to

16  the call for a stolen vehicle based upon a confirmed ALPR hit with a vehicle that

17  was the same make, model, similar year, and a dark color.

18      7.      There is no evidence the officers targeted Plaintiff or used unreasonable

19  force based upon her race and the officers are entitled to judgment in their favor on

20  Plaintiff's equal protection claim.

21      8.      Qualified immunity protects "all but the plainly incompetent or those

22  who knowingly violate the law." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

23      9.      A public employee is entitled to qualified immunity even if that

24  employee makes a good faith mistake about the law. Qualified immunity protects

25  "all but the plainly incompetent or those who knowingly violate the law." *Saucier*,

26  533 U.S. at 202, 205.

27      10.     It is Plaintiff's burden to show that the rights allegedly violated by

28  Defendants were clearly established in 2020. See *Shafer v. County of Santa Barbara*,

868 F.3d 1110, 1118 (9th Cir. 2017).

11.   Based on the undisputed evidence, Defendants Adam Falossi, Stephen Comp, Michael Downs, Jonathan De La Cruz, Kevin Orth and James Keenaghan are entitled to qualified immunity.

12.   To state a constitutional claim for violation of civil rights against a public entity, a plaintiff must establish not only a constitutional deprivation, but also the existence of a local public policy, custom or practice that is the cause in fact of that constitutional deprivation. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690-691 (1978).

13.   A municipality cannot be vicariously liable under section 1983. *Monell*, 436 U.S. at 690-691.

14.   To state a viable section 1983 claim against a municipality, the plaintiff must plead and prove that (1) he or she was deprived of a specific constitutionally protected right; (2) the employee of the municipality caused the constitutional deprivation by implementing a public policy, statement, ordinance, regulation, or decision officially adopted and promulgated by the municipality; and (3) there exists an affirmative link between the unconstitutional custom or policy and the specific constitutional injury. *Monell*, 436 U.S. at 696; see also, *City of Canton Ohio v. Harris*, 489 U.S. 378 (1988); and *Rizzo v. Goode,* 423 U.S. 362 (1976).

15.   A single incident involving a constitutional deprivation by a municipal employee cannot establish liability under *Monell* absent evidence that a municipal officer with policy making authority expressly authorized the conduct resulting in the constitutional deprivation. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985).

16.   A single constitutional deprivation ordinarily is insufficient to establish a longstanding practice or custom. *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).

17.   Liability for improper custom may not be predicated on isolated or

sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

18.   "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio*, 489 U.S. at 388.

19.   The term "deliberate indifference" presupposes a deliberate choice to follow a course of action among various alternatives. Neither negligent training of an employee nor a sound program occasionally administered negligently constitutes "deliberate indifference." *City of Canton, Ohio*, 489 U.S. at 389-391.

20.   Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Kirkpatrick v. Cty. of Washoe*, 843 F.3d 784, 794 (9th Cir. 2016).

21.   Liability cannot be established simply by showing that an injury could have been avoided if a public employee had better or more training. *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991).

22.   Defendant City of Beverly Hills is entitled to entry of summary judgment in its favor and against Plaintiff on his *Monell* claim.

23.   A plaintiff is allowed to recover punitive damage in a section 1983 case where a defendant's conduct is "shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

///

///

///

///

///

24.     Officers Falossi, Comp, Downs, De La Cruz and Sergeants Orth and Keenaghan are entitled to entry of summary judgment in their favor on Plaintiff's claim for punitive damages.


DATED: _____        _____
                                    HONORABLE ANDRE BIROTTE JR.
                                    UNITED STATES DISTRICT
                                    JUDGE

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am over the age of 18 and not a party to the within action; I am employed by KOLAR AND ASSOCIATES in the County of Orange at address is 12241 Newport Avenue, Santa Ana, CA

On May 11, 2023, I served the foregoing document(s) described as: **DEFENDANTS' STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

☐     by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list;

☐     **(BY MAIL)** I placed said envelope(s) for collection and mailing, following ordinary business practices, at the business offices of KOLAR AND ASSOCIATES and addressed as shown on the attached service list, for deposit in the United States Postal Service. I am readily familiar with the practice of KOLAR AND ASSOCIATES for collection and processing correspondence for mailing with the United States Postal Service, and said envelope(s) will be deposited with the United States Postal Service on said date in the ordinary course of business.

☒     **(BY ELECTRONIC SERVICE)** by causing the foregoing document(s) to be electronically filed using the Court's Electronic Filing System which constitutes service of the filed document(s) on the individual(s) listed on the attached mailing list.

☐     **(BY OVERNIGHT DELIVERY)** I placed said documents in envelope(s) for collection following ordinary business practices, at the business offices of KOLAR AND ASSOCIATES, and addressed as shown on the attached service list, for collection and delivery to a courier authorized by GSO/GLS and/or FedEx to receive said documents, with delivery fees provided for. I am readily familiar with the practices of KOLAR AND ASSOCIATES for collection and processing of documents for overnight delivery, and said envelope(s) will be deposited for receipt by GSO/GLS and/or FedEx on said date in the ordinary course of business.

☐     **(BY PERSONAL SERVICE)** I delivered such envelope(s) by hand to the offices of the addressee(s).

☒     (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct.

Executed on May 11, 2023 at Santa Ana, California.

_____

- 38 -

REANN GRANT

**ASHLEY BLACKMON v. CITY OF BEVERLY HILLS, et al.**

**USDC, CENTRAL DISTRICT OF CALIFORNIA**
**CASE NO. 2:21-cv-08381-AB (AFMx)**

**ASSIGNED FOR ALL PURPOSES TO**
**HONORABLE ANDRE BIROTTE, JR.**
**COURTROOM 7B**
**MAGISTRATE JUDGE ALEXANDER F. MACKINNON**
**COURTROOM 780**

**SERVICE LIST**

Morgan Ricketts                           Attorney for Plaintiff
HADSELL STORMER RENICK & DAI   **ASHLEY BLACKMON**
128 N. Fair Oaks, Unit 204
Pasadena, CA  91103

Telephone: (626) 775-7870

Email: mricketts@hadsellstormer.com
nmolina@hadsellstormer.com