Morgan Ricketts, Esq. (S.B. # 268892)
**HADSELL STORMER RENICK & DAI LLP**
128 N. Fair Oaks Ave.
Pasadena, CA 91103
Telephone: (626) 585-9600
Facsimile: (626) 577-7079
Email: mricketts@hadsellstormer.com

Attorney for Plaintiff Ashley Blackmon

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ASHLEY BLACKMON, an individual,<br>   Plaintiff,<br><br>   v.<br><br>CITY OF BEVERLY HILLS; BEVERLY HILLS POLICE SERGEANT KEVIN ORTH, JAMES KEENAGHAN, BEVERLY HILLS POLICE OFFICER ADAM FALOSSI (#04678), BEVERLY HILLS POLICE OFFICER STEPHEN COMP, BEVERLY HILLS POLICE OFFICER JONATHAN DE LA CRUZ, BEVERLY HILLS POLICE OFFICER MICHAEL DOWNS, all sued in their individual capacities; and DOES 1-10, inclusive;<br>   Defendants. | Case No.: 2:21-CV-08381-AB (AFMx)<br><br>[Assigned to the Honorable André Birotte Jr. – Courtroom 7B]<br><br>**SURREPLY IN SUPPORT OF BLACKMON'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:       June 16, 2023<br>Time:       10:00 a.m.<br>Ctrm.:       7B<br><br>Trial Date: October 3, 2023 |

---
SURREPLY ISO BLACKMON MSJ

**INTRODUCTION**

Plaintiff Blackmon files this Surreply with the Court's permission, solely to support her Motion for Partial Summary Judgment as to liability. See Dkt 77, filed May 12, 2023.

There is one question at the heart of this case. When officers have reasonable suspicion to believe a car is stolen, may they point guns indiscriminately regardless of the suspect's behavior? The Ninth Circuit has said, quite clearly, that the answer is no. Plaintiff agrees, and so should this Court. Partial summary judgment on liability should be granted against all six officer Defendants and the City of Beverly Hills on several claims.

Defendants make various points in opposition; none are significant enough to warrant denial of partial summary judgment as to any Defendant.

First, Defendants complain that Plaintiff's cases are not specific enough to inform officers that evidence of a car theft alone is insufficient to support an inference that the suspect is dangerous. But the claim that *Washington*, *Green*, and *Rahr* are all distinguishable can only be described as nitpicking.

Second, Defendants claim that it is generally accepted that traffic stops are dangerous and officers are so trained in the Academy; it is generally accepted in law enforcement that stolen vehicles justify the high risk stop. These "facts" are self-serving and unsupported by objective evidence. Even if true, they do not justify ignoring established Ninth Circuit precedent.

Third, officers had reasonable suspicion to make the stop, and quickly ended it once they had investigated. Civil rights violations, however, can take mere seconds, and can happen alongside other legitimate actions. Plaintiff only challenges excessive measures – not the reasonable aspects of the investigation.

Fourth, officers did not point their guns at Plaintiff's head and/or officers had their guns pointed only in her general direction and/or they did not have their fingers on the trigger and/or some officers did not display their guns.

1

Quibbling over exactly where the firearm was pointed, when three were admittedly pointed in Plaintiff's direction, misses the mark. Any shooting is deadly force, even if it misses the suspect entirely. Similarly, aiming guns does not become acceptable if a different part of the body is targeted.

Fifth, Defendants argue that some evidence, as presented, is inadmissible. But Plaintiff need not present evidence in an admissible form at this stage.

These arguments in no way undermine Blackmon's Fourth Amendment claim, *Monell* claim, or state claims. Partial summary judgment should be entered.

## ARGUMENT

### I. *Washington*, *Green*, and *Rahr* Control, And Clearly Put Officers On Notice That Their Tactics Were Unreasonable.

The First and Sixth Circuits have concluded that "[i]f it defeats the qualified immunity analysis to define the right too broadly (as the right to be free from excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed officers during Tuesday siestas)." *Kent v. Oakland County*, 810 F. 3d 384, 396 (6th Cir. 2016), citing *Hagans v. Franklin County Sheriff's Office*, 695 F. 3d 505, 508 (6th Cir. 2012); see also *Belsito Communications, Inc. v. Decker*, 845 F. 3d 13, fn. 9 (1st Cir. 2016). Defendants here essentially seek to distinguish *Washington*, *Green* and *Rahr* on the basis that the officers were not all left handed, and it was a Tuesday afternoon break rather than a siesta.

Defendants argue, for example, that because reasonable suspicion existed here, *Green* and *Washington* do not apply, since both involved questions as to that issue. But both cases explicitly reject this argument. Instead, they each clearly affirm that these tactics are problematic *even with* reasonable suspicion.

In *Washington*, for example, which was a grant of judgment as a matter of law affirmed on appeal, the Ninth Circuit said,

> In this nation, all people have a right to be free from the terrifying and humiliating experience of being pulled from their cars at gunpoint, handcuffed, or made to lie face down on the pavement when insufficient reason for such intrusive police conduct exists. <u>The police may not employ such tactics *every time* they have an "articulable basis" for thinking that someone may be a suspect in a crime.</u> The infringement on personal liberty resulting from so intrusive a type of investigatory stop is simply too great. <u>Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment.</u>
> *Washington v. Lambert*, 98 F. 3d 1181, 1187 (9th Cir. 1996) (emphasis added).

Nearly two decades later, *Green* held identically that reasonable suspicion does not solve the problem with these intrusive, extreme tactics:

> <u>[E]ven if reasonable suspicion *was* established, it alone is not enough to justify such intrusive tactics.</u> This court has "consistently applied the principle that drawing weapons and using handcuffs or other restraints is unreasonable in many situations" involving investigatory or *Terry* stops. *Robinson v. Solano* County, 278 F.3d 1007, 1015 (9th Cir.2002); *see also Washington,* 98 F.3d at 1187 ("<u>Under ordinary circumstances, when the police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs and other restraints will violate the Fourth Amendment.</u>").
> *Green v. City and County of San Francisco*, 751 F.3d 1039, 1050 (9th Cir. 2014) (emphasis added).

*Green* clearly held that suspicion of a stolen vehicle does not automatically justify extreme tactics:

> The fact that Green was stopped on suspicion of a stolen vehicle does not by itself demonstrate that she presented a danger to the officers. Furthermore, numerous factors – that law enforcement lacked any specific information that she was armed, that Green was compliant with instructions at all times, that there was no evidence of recent violence, and that the police significantly outnumbered Green so as to diminish the risk she posed—count against such a finding.
> *Green v. City and County of San Francisco*, 751 F.3d 1039, 1050 (9th Cir. 2014).

3

   Defendants grasp at trivial distinctions, such as the length of the stop being 10 or 20 minutes instead of six here – a fact which was disputed in *Green* and goes only to damages in any event – and Plaintiff's apparent lack of knee problems. Surely this is a "Tuesday afternoon siesta" distinction.

   Besides, Beverly Hills has never identified any such systematic exceptions it expects officers to apply in these stops to, for example, disabled individuals. The 30(b)(6) witness testified that there is nothing the suspect could do to avoid the procedure. See Dkt. 85-1, Plaintiff's Opposition to Defendants' Fact 23. Sergeant Orth testified that he would use the procedure on nonagenarian Betty White if she were driving a stolen car, pursuant to Beverly Hills policy. *Id*., and Plaintiff's Fact 15. And in fact, one of the individuals Beverly Hills held at gunpoint was in a wheelchair. *Id*. at Plaintiff's Fact 21.

   *Green* further urged that the availability of alternatives is to be considered in determining whether gun points are reasonable in a stolen vehicle stop, and identified that at a minimum, the *Green* officers could have utilized the low ready position. Here, Beverly Hills concedes officers also had tasers, OC spray, batons, and according to their policy, beanbag shotguns in the sergeant's cars, yet did not prepare them or have them available to use instead of a firearm. Dkt. 85-1, Plaintiff's Facts 138-141. Viable alternatives were available, yet officers used *none* of them.

   Defendants argue they did not point guns at Blackmon's head, as the officers in *Rahr* did, and did not threaten to kill her. Plaintiff disagrees: three guns pointed at her constituted a threat to kill her. The point of *Rahr* is that even at a traffic stop where a weapon is known to be present, officers cannot point guns at cooperative people and put them in fear of their lives. *Rahr* held that this was a constitutional violation, that the "low ready" position would have been "a superior option", and then dismissed based on qualified immunity (before this stop occurred). The officers here should have known from *Rahr* that if they are

4

PLTF'S SURREPLY ISO MSJ

not allowed to point guns at a cooperative suspect simply because a weapon is present, they were not entitled to point guns at Plaintiff, who was unarmed.

It should be noted that *Green* affirmed a denial of summary judgment as to the plaintiff because there were triable issues of fact. *Green* at 1051. But in Green, there were disputed facts such as the length of the stop, how many officers pointed guns at her, and no bodyworn camera footage. This case, however, documents the stop from multiple angles, from start to finish. No material disputed facts occur off-camera. All of the video and testimony agree: Blackmon was cooperative at all times, obeyed all instructions promptly, was nonthreatening, was unarmed, was not suspected to be armed, was not suspected of involvement in any violent crime, and there was no information to suggest that a violent crime was about to be committed. The *Washington* factors simply were not present and Defendants raise no special circumstance.

In *Theney*, where summary judgment was denied to the plaintiff, a triable issue of fact remained as to whether a reasonable officer would have heard a correction broadcast over the police radio by a different, female dispatcher where ordinarily the correction would be expected to come from the original, male dispatcher. This case has no such individualized dispute of fact for a jury to decide. Plaintiff merely relies on the law as articulated in *Washington*, *Green*, and *Rahr*. The undisputed facts of this stop do not get Defendants out from under those cases. There were no special circumstances. Defendants used especially intrusive measures. There are no disputed facts. It was a constitutional violation. Qualified immunity is unavailable under *Washington*, *Green*, and *Rahr*. Partial summary judgment should be granted.

## II. Ninth Circuit Precedent Controls – Not Training.

A constitutional violation can occur even when officers follow their training. *City of Canton v. Harris*, 436 U.S. 658 (1978). Municipalities can be liable for failure to train their officers, if their officers commit constitutional

5

violations as a result of that failure to properly train. *Id*. Thus, officers who act in accordance with their training may still be liable under § 1983, and so may their employers under *Monell*. Defendants essentially argue that if there is a Monell failure to train, then there can be no individual liability by the officer. They provide no authority that Plaintiff must choose between these claims, and the argument should not be entertained. Just a few weeks ago in the Central District, a jury verdict was returned finding the officer liable, and also finding that the municipality had failed to train the officer. *See Pineda v. City of Los Angeles*, 2:21-cv-06470, Dkt. 171 (Verdict Form).

Defendants present self-serving, uncorroborated (except by biased witnesses) testimony that they were trained in the Academy to perform the high risk procedure for every stolen vehicle stop. The evidence shows that Defendants do not actually do this. Instead, 25% of the time Beverly Hills officers choose a less intrusive means of conducting the stop. Who are the 25% that do not have to undergo this procedure? If the *Washington* factors are not being used to decide who gets held at gunpoint and who doesn't, then what criteria *is* being used? Are these police-determined criteria as objective, fair, and reasonable as the four special circumstances enumerated in *Washington*?

**III.     Otherwise Proper Investigative Procedures Do Not Justify The Use Of Excessive Force.**

The fact that officers may have been conducting legitimate police business by investigating, questioning, or even detaining a person does not excuse the use of excessive force. See, *Blankenhorn v. City of Orange*, 485 F. 3d 463 (9th Cir. 2007).

Detentions of drivers, even if brief and limited in scope, may violate the Constitution. Delaware v. Prouse, 440 U.S. 648, 663 (1979). The fact that this particular detention was brief does not preclude a finding that it was impermissibly severe in intrusiveness.

### IV. Officers Concede They Aimed Guns At Plaintiff And In Her Direction; The Precise Angle Of Their Guns Is Irrelevant.

Defendants have already conceded that they pointed guns "at" Plaintiff and that the policy is to point guns "at" the driver for the duration of the stop until the situation is under control. See Dkt. 85-1, Plaintiff's Response to Defendants' Fact 23. They now seek to argue that instead, they had their guns at "low ready" and not directly "at" Plaintiff. Even if these assertions were not self-serving changes in their sworn testimony, they would not change the outcome here.

The precise angle of the guns is irrelevant unless the angle makes it clear to the person being detained that they are not at immediate risk of being shot. Defendants want Rahr to mean that so long as the gun is not pointed at the plaintiff's head, it is in the "low ready" position approved by *Green*. Not so. A gunshot that misses the suspect entirely is still a use of deadly force. If binding precedent disapproves the pointing of a gun at suspects, it is unreasonable to believe that it is nonetheless acceptable to instead point the gun slightly to their left. That is still pointing the gun at them. All the same concerns apply: the suspect is still likely to be frightened and humiliated, and the suspect is not safe from an accidental discharge.

The clear import of *Washington*, *Green* and *Rahr* is that pointing a gun at someone is dangerous and terrifying, and should be avoided absent a suggestion of weapons, violence, or at least resistance – or some other equally weighty consideration. The statement that the *Rahr* defendants should not have pointed guns at the plaintiff's head but instead held them in a "low ready" position obviously does not mean officers can just point their guns anywhere that is lower than the head. That was simply a fact that rendered the situation even more egregious than if the gun had been pointed at the plaintiff's chest. It would be a cruel misreading of *Green* to find that the constitutionally permissible "low

7

ready" position simply means the officer believes he would miss by a few inches if he fired. Officers miss their mark all the time. Why should citizens trust their lives to an officer's calculations, particularly in what is already a stressful situation? Plaintiff instead submits that low ready, as intended by *Green*, must mean pointed straight down at the ground, or very nearly so, that it is clear to the suspect that they are not in immediate danger.

The relevant force used in *Green* was simply pointing guns in the plaintiff's direction. No distinction is made as to exactly where the guns were pointed. The clear implication is where the guns were specifically pointed does not matter for Fourth Amendment purposes, so long as they were pointed in the plaintiff's direction. Any reasonable person would understand that having a gun pointed at one's side is a frightening experience. No reasonable person would want to have a loaded gun pointed in their direction so long as the holder didn't intend to aim it directly at their body. Where does it end? If the officer aims an inch to the left? The answer must be that the gun barrel must be pointed in a safe direction that does not pose a risk to the suspect or bystanders in the event of accidental discharge – i.e., straight down or almost so.

In addition, Defendants minimize the time that Plaintiff spent on the other side of a loaded gun. From at least 17 seconds into Comp's video, Plaintiff is continuously under the threat of being shot by Falossi, Comp, and/or Downs until Comp handcuffs her. *See* Defendants' Exh. O at 0:17-2:57 and Defendants' Exhibit P, Downs BWC, at 0:06-2:46. Comp and Falossi point guns at Plaintiff until nearly the 3:00 mark, when Comp lowers his gun to handcuff her. *See* Exh. O at 2:55-3:00. Thus, Plaintiff was held at gunpoint for at least 2 minutes, 38 seconds. Anyone who has been threatened with a gun knows that even a few seconds is an eternity.

### V. Plaintiff Need Not Present Admissible Evidence, Only Evidence That Could Be Presented In Admissible Form At Trial.

PLTF'S SURREPLY ISO MSJ

Plaintiff need not produce evidence in admissible form at summary judgment, only evidence that could be presented in an admissible form at trial. *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F. 3d 936, 964 fn. 7 (9th Cir. 2011) ("Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial."); *see also Block v. City of Los Angeles*, 253 F. 3d 410, 418-419 (9th Cir. 2001) (at summary judgment, "a party does not necessarily have to produce evidence in a form that would be admissible at trial.").

## VI. Orth, Keenaghan and De La Cruz Are Liable For Failing To Intervene.

Officers have a duty to intercede when their fellow officers violate the constitutional rights of a citizen, and they have an opportunity to intercede. *Cunningham v. Gates*, 229 F. 3d 1271, 1289 (9th Cir. 2000). Plaintiff here is entitled to summary judgment because there are no material facts in dispute. Everything is audio and video recorded. The footage and the radio traffic clearly demonstrate that Orth, Keenaghan and De La Cruz were aware that other officers pointed guns in Plaintiff's direction and forced her to walk backwards at gunpoint until she was commanded to kneel and be handcuffed. Defendants Orth, Keenaghan and De La Cruz had the opportunity to observe that Plaintiff was unarmed and cooperative, never heard anything on the radio traffic or from any of the officers present that there was some indication of a weapon or past or potential violence, and had a clear opportunity to intercede, and yet did not. See Defendants Exhibits N, Q, and R (De La Cruz, Orth, and Keenaghan BWC) and W (dispatch audio recording). They are all liable.

## CONCLUSION

Based on the overwhelming statistical evidence that car thieves are not especially dangerous, not likely to resist, not likely to have weapons, and overwhelmingly unlikely to cause injury to police compared with other activities

9

that are treated far more casually, the Court should find that Beverly Hills' policy of treating suspected vehicle thefts based on solely on ALPR hits as if there are always special circumstances justifying the use of high risk procedures unreasonable as a matter of law.

Multiple reasonable alternatives were available: pointing guns down at the ground and not handcuffing suspects where they are clearly outnumbered by police; using less lethal weapons instead of firearms to maintain control; and alternatively, simply asking the person for their name, and if they know that their vehicle is stolen and whether they have any explanation for the situation before making a determination as to whether extreme measures are appropriate.

Partial summary judgment should be entered as to liability on Plaintiff's Monell claim against the City of Beverly Hills.

In addition, because Defendants cite no authority allowing them to pass responsibility for their own actions off to training institutions, and based on the same statistical evidence and these specific officers near total lack experiences finding weapons or resistance on ALPR stolen vehicle hits, the individual Defendants should also be held accountable for not following *Washington*, *Green*, and *Rahr*. Partial summary judgment should be entered as to liability on Plaintiff's excessive force claim against Falossi, Comp, and Downs; and on Plaintiff's failure to intervene claim against all the individual officers, as well as on Plaintiffs' state law claims.

**DATED:** June 2, 2023

**By: RICKETTS LAW**

*Morgan Ricketts*
Morgan Ricketts

PLTF'S SURREPLY ISO MSJ