1
2
3
4
5
6
7

8          UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10  ASHLEY BLACKMON, an individual, | Case No. 2:21-cv-08381-AB-AFM

11              Plaintiff,

12  v.                                **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

13

14  CITY OF BEVERLY HILLS;
    BEVERLY HILLS POLICE
15  SERGEANT KEVIN ORTH, JAMES
    KEENAGHAN, BEVERLY HILLS
16  POLICE OFFICER ADAM FALOSSI
    (#04678), BEVERLY HILLS POLICE
17  OFFICER STEPHEN COMP,
    BEVERLY HILLS POLICE OFFICER
18  JONATHAN DE LA CRUZ,
    BEVERLY HILLS POLICE OFFICER
19  MICHAEL DOWNS, all sued in their
    individual capacities; and DOES 1-10,
20  inclusive;
21
22
23              Defendants.
24

25      On May 11, 2023, Defendants City of Beverly Hills, Sergeant Kevin Orth,

26  Sergeant James Keenaghan, Officer Adam Falossi, Officer Stephen Comp, Officer

27  Jonathan De La Cruz, and Officer Michael Downs ("Defendants") filed a Motion for

28  Summary Judgment or Partial Summary Judgment ("Motion," Dkt. No. 70).  In

response, Plaintiff Ashley Blackmon ("Plaintiff") cross filed a Motion for Partial Summary Judgment and an opposition ("Cross-Motion," Dkt. No. 85).   Defendants filed a reply in support of their Motion, and an opposition to Plaintiff's Cross-Motion ("Def. Reply," Dkt. No. 89).   Plaintiff then filed a reply in support of her Cross-Motion ("Pl.'s Reply," Dkt. No. 94).   The Court heard oral argument on June 14, 2023, and took the matter under submission.   For the foregoing reasons, the Court **GRANTS** Summary Judgment in favor of Defendants as to Plaintiff's seventh cause of action.   Defendants' Motion is otherwise **DENIED** and Plaintiff's Cross-Motion is **DENIED**.

## I.   FACTUAL BACKGROUND

The following facts are undisputed, excepted where otherwise noted.[1]

### A.   Beverly Hills Police Department ("BHPD") Practices

The City of Beverly Hills ("the City") employs sworn police officers who have attended and graduated from a police academy certified by the California Commission on Peace Officer Standards and Training ("P.O.S.T."), which includes several hours of training on conducting lawful arrests and implicit and explicit biases.   (DSUF ¶¶ 116–119.)   The City also requires new police recruits to undergo a two week orientation followed by an intensive one-week P.O.S.T. approved Field Training Program.   (DSUF ¶ 120.)   The City has written policies in place regarding police officer authority to use force against another, which are taught and demonstrated frequently during the field training program.   (DSUF ¶ 127.)

BHPD officers are trained that stopping persons driving motor vehicles can be

---

[1] The facts are taken from Plaintiff's Separate Statement of Undisputed Facts ("DSUF," Dkt. N0. 85-1), which contains Plaintiff's responses to Defendants' Statement of Uncontroverted Facts, Defendants' Response to Plaintiff's Statement of Uncontroverted Facts ("PSUF," Dkt. No. 91), and the admissible exhibits submitted by the parties.   Both parties purport to dispute some of the facts, but upon reviewing the evidence, the Court finds that, except where disputes are noted, the disputes relating to the facts described herein are either not material or are not genuine.

one of the most dangerous duties a patrol officer can perform.  (DSUF ¶ 16.)
According to BHPD training, a high risk traffic stop is one where an officer has reason
to believe that one of more occupants has committed a felony or is armed.  (DSUF ¶¶
19, 21–22.)  BHPD officers are trained that each traffic stop, including each high-risk
stop, may present different circumstances and the general procedures may be adapted
depending on what the officers are facing during the stop.  (DSUP ¶ 21.)  The high-
risk stop procedure generally involves an officer initiating a traffic stop with
additional units.  (DSUF ¶ 22.)  Officers are trained to instruct the driver to throw
their keys out the window, direct the driver and any occupants to exist, have the
person who exited the vehicle face away from the officers and walk backwards
towards the officers to be handcuffed in a kneeled or prone position, before being
placed in the back of patrol vehicle while officers conduct their investigation.  (DSUF
¶ 25.)  Officers may unholster their primary weapon and point it in the direction of the
driver or vehicle at a "low-ready" position.  (DSUF ¶ 24.)  It is undisputed that a "low
ready" position describes when an officer unholsters his weapon without their finger
on the trigger, but the parties dispute how low a firearm must be aimed in relation to a
suspect.  (DSUP ¶ 34.)

Plaintiff has undertaken an analysis of the BHPD's traffic stops based on
Automated License Plate Reader ("ALPR") generated traffic stops in the City between
January 1, 2015 to February 9, 2020.  Defendants dispute and object to this analysis in
its entirety, which are overruled without prejudice for the reasons further explained in
this Order.  From the 445 ALPR reports Defendants produced, Plaintiff claims 310
provide insight into the BHPD's practices, along with other information regarding the
nature of the stops.  (PSUF ¶¶ 123–125.)  Plaintiff contends that 75% of stops for
investigating potentially stolen license plates were conducted using "high risk traffic
stop" procedures.  (PSUF ¶ 5.)  However, Plaintiff claims that 20% of stops were the
result of late payments of disputes with car rental companies, in 21% of stops
involving firearms, the driver was in lawful possession of the vehicle, 35% of stops

1  did not result in any arrest, and in only 5% of stops did an individual have a weapon
2  or tool.  (PSUF ¶¶ 19, 32, 34, 40.)

3      **B.    Defendants' Stop of Plaintiff**

4      Plaintiff is a Black woman who was 30 years old at the time of the relevant
5  events.  (PSUF ¶ 64.)  In July 2019, Plaintiff leased a 2019 Black Toyota Rav-4, with
6  an issued license plate of 8KYC428.  (PSUF ¶¶ 65–66.)  On November 20, 2019, a
7  grey Toyota with the license plate 8HCW465 was reported stolen.  (PSUF ¶¶ 67–68.)
8  At some point between November 20, 2019 and February 9, 2020, someone switched
9  the license plate between the stolen car and Plaintiff's car, which Plaintiff did not
10  notice.  (PSUF ¶ 68.)

11      On February 9, 2020, at approximately 9:51 a.m., Plaintiff drove her vehicle
12  with the stolen plate through the intersection of La Cienega and Gregory Way, which
13  was equipped with an ALPR.  (PSUF ¶¶ 76.)  The ALPR registered the license plate
14  as belonging to a stolen vehicle and the BHPD dispatch broadcasted this information,
15  and the direction the vehicle was headed.  (PSUF ¶¶ 7 –78.)

16      Officers Adam Falossi and Stephen Comp responded to the ALPR hit.  (PSUF
17  ¶¶ 78–80.)  While following Plaintiff's vehicle, Officer Falossi requested backup from
18  other BHPD officers, an airship, and a supervisor.  (PSUF ¶ 84.)  He confirmed to
19  dispatch that the license plate on Plaintiff's car was reported stolen, and noted that the
20  stolen vehicle was grey, but Plaintiff's vehicle was black.  (DSUF ¶¶ 8, 10.)  Officer
21  Falossi also stated to dispatch, "I don't know if this was a plate swap or not."  (PSUF
22  ¶ 87.)  A plate swap occurs when the license plate of a stolen vehicle is placed on
23  another vehicle.  (DSUF ¶ 12.)  Officer Falossi reasonably suspected that Plaintiff's
24  vehicle was stolen based on his training and the swapped license plate.  (DSUF ¶ 30.)

25      Once Officer Falossi confirmed that an additional unit was present, containing
26  Officers Downs and De La Cruz, he initiated a high-risk traffic stop by turning on his
27  lights.  (DSUF ¶¶ 15, 30.)  Plaintiff immediately pulled over to the right and stopped
28  her vehicle near other parked cars.  (PSUF ¶ 91.)  Officers Falossi, Comp, Downs and

De La Cruz exited their vehicles and unholstered their firearms. (PSUF ¶ 92.)  Officer Falossi stood in his vehicle's open doorway and unholstered his firearm. (DSUF ¶ 31.)  According to Officer Falossi's testimony, he pointed his firearm at the driver, Plaintiff. (PSUF ¶ 110.)  Officer Comp positioned his patrol vehicle to the left of Officer Falossi's vehicle, opened his door, and stood in the space between his car door and the frame of the vehicle. (DSUF ¶ 43.)   Officer Comp had his firearm unholstered and held it in a two handed hold. (DSUF ¶ 43.)  Officer Downs's vehicle was approximately 35–40 feet from Plaintiff's vehicle, and was  positioned to the left and rear of Officer Comp's patrol vehicle at a slight angle straddling the center median and number one northbound lane on La Cienega. (DSUF ¶¶ 63–64.)  When Officer Downs exited the vehicle, he positioned himself in the space between his opened car door and the frame of the car, and unholstered his firearm. (DSUF ¶ 65.)  When Officer De La Cruz arrived at the scene, he exited his vehicle and walked to Officer Falossi's vehicle; he opened the passenger door and positioned himself between the door and frame of the car. (DSUF ¶¶ 74–75.)  He unholstered his firearm and oriented it toward the general area of the passenger side of Plaintiff's vehicle. (DSUF ¶ 77.)  Officer De La Cruz never pointed his firearm at Plaintiff, or towards the driver side of the vehicle. (DSUF ¶ 77.)

Plaintiff was instructed to throw her keys out the window, which she was unable to do. (DSUF ¶ 35.)  After a few seconds, Officer Falossi instructed Plaintiff to get out of the vehicle and she complied. (DSUF ¶ 36.)  Plaintiff faced away from the officers and held her hands up as instructed. (DSUF ¶ 37.)  She then walked backwards towards the officers and kneeled on the ground as instructed. (DSUF ¶ 38.)  Field Sergeants Kevin Orth and James Keenaghan arrived as Plaintiff was walking backwards, and observed the stop. (DSUF ¶¶ 83–96.)  Their role was to provide supervision to the officers investigating the potentially stolen vehicle. (DSUF ¶ 82.)  Sergeant Keenaghan never unholstered his firearm. (SUF ¶ 86.)  Sergeant Orth approached the passenger side of Officer Falossi's car where Officer De La Cruz was

1   positioned and unholstered his weapon, which he oriented towards the passenger side
2   of Plaintiff's vehicle.  (DSUF ¶ 90.)

3        Plaintiff asked what was happening, and was told to put her palms together as
4   though she were praying.  (PSUF ¶ 104.)  Officer Comp holstered his firearm and
5   placed handcuffs on Plaintiff.  (DSUF ¶ 48.)  Throughout his interactions with
6   Plaintiff, Officer Comp use clear and concise language in a calm manner to
7   communicate with Plaintiff.  (DSUF ¶ 49.)  Officer Comp then walked Plaintiff to the
8   back rear of his patrol vehicle and asked her name.  (DSUF ¶ 54.)  Officer Comp used
9   her name when communicating with her, and informed her that everything would be
10  explained in a moment.  (DSUF ¶ 54.)

11       Officer Comp then asked Plaintiff is she had any weapons on her.  (DSUF ¶
12  55.)  Plaintiff was crying during this interaction.  (Defs.' Ex. O at 3:32-3:46.)  The
13  parties dispute whether Plaintiff reacted in a way that would lead Officer Comp to
14  believe she consented.  (*See* DSUF ¶¶ 55–56.)  The parties also dispute the extent to
15  which Officer Comp searched Plaintiff for weapons.  (*See* DSUF ¶ 57.)  However, it is
16  undisputed that Officer Comp touched and manipulated Plaintiff's outerwear to check
17  her for weapons.  (DSUF ¶ 57.)  Afterwards, Officer Comp escorted Plaintiff to the
18  back of a patrol vehicle and had her sit inside.  (DSUF ¶ 59.)  Sergeant Keenaghan
19  stood by Plaintiff while the patrol vehicle door was open.  (DSUF ¶ 96.)

20        Once Plaintiff was secured, Officer Downs maintained his position until other
21  officers cleared Plaintiff's vehicle.  (DSUF ¶ 68.)  Officers Falossi, De La Cruz, and
22  Comp approached the vehicle with their firearms drawn and confirmed no other
23  occupants were in the vehicle.  (DSUF ¶ 98.)  Once the officers checked the Vehicle
24  Identification Number of Plaintiff's vehicle, they discovered that her license plate had
25  been stolen, and swapped with the plates of a stolen vehicle.  (PSUF ¶ 114.)  Plaintiff
26  was then unhandcuffed and informed she was stopped because the ALPR had reported
27  the plates as stolen.  (PSUF ¶ 115.)  Officers Falossi and Sergeant Orth then attempted
28  to explain the rationale for the high-risk stop.  (DSUF ¶ 104.)  During this exchange,

1    repeatedly Plaintiff stated, "This is racist."  (DSUF ¶ 106; Defs. Ex. Q at 15:00-
2    15:14.)

3          The entire stop, starting from the time Plaintiff was signaled to pull over and
4    including the time it took to explain the stop to Plaintiff, was approximately 17
5    minutes.  (DSUF ¶ 107.)  From the time Plaintiff was pulled over and exited the
6    vehicle was approximately one minute and 40 seconds.  (DSUF ¶ 108.)  From the time
7    Plaintiff exited her vehicle and was placed into handcuffs was approximately one
8    minute.  (DSUF ¶ 109.)  Plaintiff spent approximately three minutes in handcuffs.
9    (DSUF ¶ 110.)  At no time after handcuffs were placed on Plaintiff were any firearms
10   oriented towards Plaintiff.  (DSUF ¶ 97.)  Additionally, no officer used any
11   derogatory remarks, racial or otherwise, to Plaintiff or made any verbal threats.
12   (DSUF ¶¶ 111–113.)

13         **C.    Plaintiff's Claims**

14         Plaintiff is now suing Officers Comp, Downs, Falossi, and De La Cruz and
15   Sergeants Keenghan and Orth for: False Arrest and Unreasonable Seizure in Violation
16   of Cal. Const. Art. I. § 13 and Cal. Civ. Code § 52.1 (first cause of action); Excessive
17   Force in Violation of Cal. Const. Art. I § 13 (second cause of action); Deprivation of
18   Rights in Violation of Cal. Civ. Code § 52.1 (third cause of action); Unreasonable
19   Search in Violation of Cal. Const. Art. I § 13 (fourth cause of action); (6) Excessive
20   Force in Violation of the Fourth Amendment under 42 U.S.C. § 1983 (sixth cause of
21   action); and Violation of the Fourteenth Amendment under 42 U.S.C. § 1983 (seventh
22   cause of action).  Plaintiff is also suing Officer Comp and the City for Assault and
23   Battery (fifth cause of action).  Finally, Plaintiff is suing the City for Violation of
24   *Monell* under 42 U.S.C. § 1983 (eighth cause of action).

25         Defendants have moved for summary judgment on all causes of action, arguing
26   the undisputed facts show the officers acted reasonably under the circumstances and
27   the City has proper policies in place.  Defendants also argue that Sergeants Keenaghan
28   and Orth cannot be held liable via supervisory liability.  Plaintiff cross-moved for

1  partial summary judgment on Plaintiff's second, fifth, sixth, and eighth causes of

2  action, contending the undisputed facts demonstrate the officers used excessive force

3  or failed to intervene to prevent any other Defendant from doing so and that the City

4  has violated *Monell*.

5  **II.   LEGAL STANDARD**

6      A motion for summary judgment must be granted "if the movant shows that

7  there is no genuine dispute as to any material fact and the movant is entitled to

8  judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*,

9  477 U.S. 242, 247–48 (1986).  The moving party bears the initial burden of

10  identifying the elements of the claim or defense and evidence that it believes

11  demonstrates the absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477

12  U.S. 317, 323 (1986).  Where the nonmoving party will have the burden of proof at

13  trial, the movant can prevail merely by pointing out that there is an absence of

14  evidence to support the nonmoving party's case.  *Id.*  The nonmoving party then

15  "must set forth specific facts showing that there is a genuine issue for trial."

16  *Anderson*, 477 U.S. at 248.

17      "Where the record taken as a whole could not lead a rational trier of fact to find

18  for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus.*

19  *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  The Court

20  must draw all reasonable inferences in the nonmoving party's favor.  *In re Oracle*

21  *Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson*, 477 U.S. at

22  255).  Nevertheless, inferences are not drawn out of thin air; it is the nonmoving

23  party's obligation to produce a factual predicate from which the inference may be

24  drawn.  *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal.

25  1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).  "[M]ere disagreement or the bald assertion

26  that a genuine issue of material fact exists" does not preclude summary judgment.

27  *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

28  //

III.   **REQUEST FOR JUDICIAL NOTICE**

Plaintiff requests the Court take judicial notice of Plaintiff's Exhibit 8, 9, 17, and 18.  Exhibits 8 and 9 are website printouts purportedly by the FBI containing data relating to stolen property and arrests.  Exhibits 17 and 18 are maps of Beverly Hills available through the Beverly Hills' website and Google.  Plaintiff further request the Court take judicial notice that the City of Beverly Hills ends and become the City of Los Angeles on La Cienega Boulevard, north of Burton Way.

Under Federal Rule of Evidence 201, a court may take judicial notice of "matters of public record."  *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record.").  However, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

Defendants object to the admissibility of these documents, as further discussed below.  Defendants do not object or otherwise oppose Plaintiff's Request for Judicial Notice with respect to Exhibits 17 and 18.  The Court finds that it may take judicial notice Exhibits 17 and 18 under Rule 201, and further takes notice that the City of Beverly Hills ends and become the City of Los Angeles on La Cienega Boulevard, north of Burton Way.  However, with respect to Exhibits 8 and 9, the Court will take judicial notice of the documents' existence, but will not accept the facts asserted within any document as being established.

IV.   **EVIDENTIARY OBJECTIONS**

Defendants object to Plaintiff's use of the police statistics referenced in Plaintiff's Cross-Motion, the underlying evidence used to conduct the statistical analysis, on the grounds of logical relevance, legal relevance, hearsay, lack of foundation, and authentication.  (*See* Memorandum of Objections to Plaintiff's Evidence and Supporting Argument ("Objections"), Dkt. No. 90 at 1–22.)  Defendants

relatedly object to the Declaration of Chad Ziegler and Plaintiff's exhibits 3, 8, 9, and 23 on the same grounds, and improper expert opinions. (*Id.* at 25–26.) However, at the summary judgment stage, the Court should "not focus on the admissibility of the evidence's form," but "instead focus on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). While there are questions about the admissibility of this evidence by itself, Plaintiff represented at oral argument that Plaintiff's police practices expert was asked to opine on the statistics. Because expert witnesses may rely on otherwise inadmissible evidence if other expert's in their field would reasonably rely on such evidence, and the admissibility of proposed expert testimony has not been briefed, Fed. R. Evid. 703, the Court **OVERRULES** Defendants' objections without prejudice.

Defendants also make several garden variety evidentiary objections to Plaintiff's declaration, the Declaration of Negar Nosart, and other exhibits based on relevance, lack of foundation, and speculation. (*See* Objection at 22–26.) Objections that evidence is irrelevant or speculative do not typically need to be ruled on in a summary judgment setting like this one, because these types of evidence are not considered under the summary judgment standard to begin with. *See Burch v. Regents of the Univ. of Cal.*, 1110, 1119 (E.D. Cal. 2006). And where, as here, the parties file numerous objections on a summary judgment motion, it is "often unnecessary and impractical for a court to methodically scrutinize each objection and give a full analysis of each argument raised." *See Doe v. Starbucks, Inc.*, No. SACV 08-00582 AG (CWx), 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009). Accordingly, to the extent any of the objected-to evidence is relied on in this Order, those objections are **OVERRULED**. Any remaining objections are also **OVERRULED AS MOOT.** *See Burch*, 433 F. Supp. 2d 1110, 1122 (E.D. Cal. 2006) (concluding that "the court will [only] proceed with any necessary rulings on defendants' evidentiary objections").

//

//

10.

1  **V.   DISCUSSION**

2      **A.   <u>EQUAL PROTECTION</u>**

3          Defendants move for summary judgment on Plaintiff's seventh cause of action

4  under the Fourteenth Amendment.  To prevail on an equal protection claim, Plaintiff

5  must show that "defendants acted with an intent or purpose to discriminate against the

6  plaintiff based upon membership in a protected class."  *Barren v. Harrington*, 152

7  F.3d 1193, 1194 (9th Cir. 1998).  Defendants argue there is no evidence that anything

8  about the stop or use of force was race-motivated, as no officers made any comment

9  related to race and Officers Downs and De La Cruz did not know her race until

10  Plaintiff stepped out of the vehicle.  Plaintiff did not oppose Defendants' Motion with

11  respect to this cause of action in her papers and represented at oral argument that the

12  Plaintiff does not oppose the Motion on these grounds.  Accordingly, summary

13  judgment is **GRANTED** in favor of Defendants on Plaintiff's Seventh Cause of

14  Action.

15      **B.   <u>EXCESSIVE FORCE</u>**

16          Both parties move for summary judgment as it relates to Plaintiff's excessive

17  force claims.  Plaintiff's second and sixth causes of action for excessive force under

18  Cal. Const. Art. I. § 13 and the Fourth Amendment turn on the reasonableness of the

19  responding officers' actions.  The parties do not dispute that the officers had

20  reasonable suspicion to initiate the stop, but disagree on the reasonableness of the

21  officers' actions during the stop – particularly their use of firearms.  The parties also

22  move for summary judgment on the issue of qualified immunity.

23          To determine whether excessive force was used, the Court must consider: (1)

24  the severity of the intrusion; (2) evaluate the government's interest by assessing the

25  severity of the crime, whether the suspect posed an immediate threat, and whether the

26  suspect was resisting arrest or attempting to escape; and (3) balance the parties'

27  interests.  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  "[P]ointing guns at persons

28  who are compliant and present no danger is a constitutional violation."  *Thompson v.*

*Rahr*, 885 F.3d 582, 587 (9th Cir. 2018) (quoting *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009)).

However, "[q]ualified immunity attaches when an official's conduct does not violate a clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido, Cal. V. Emmons*, 139 S. Ct. 500, 503 (2019). To determine whether qualified immunity applies, the Court must assess (1) whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts . . . show the officer's conduct violated a constitutional right," and (2) "whether the right was clearly established" at the time of the officer's conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). For a right to be "clearly established," existing "precedent must have placed the statutory or constitutional question beyond debate," such that "every" reasonable official, not just "a" reasonable official, would have understood that he was violating a clearly established right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L.Ed.2d 1149 (2011).

For the foregoing reasons, Defendants' Motion and Plaintiff's Cross-Motion are **DENIED** as it relates to Plaintiff's excessive force claims.

### 1.    Officers Comp, Downs, and Falossi

The Court finds there is a genuine issue of material fact as to whether Officers Comp, Downs, and Falossi violated Plaintiff's constitutional rights through their use of firearms to effect the stop.

Defendants argue the officers acted reasonably in using firearms because stolen vehicles are often associated with other crimes which heighten safety concerns for the public, occupants, and officers. Defendants argue that the Ninth Circuit has acknowledged that a "low-ready" gun positioning mitigates the degree of intrusiveness when conducting a traffic stop using high-risk procedure. *See Green v. City & County of San Francisco*, 751 F.3d 1039, 1050 (9th Cir. 2014).

Plaintiff argues Officers Falossi, Comp, and Downs used excessive force as a matter of law because the circumstances did not warrant pointing firearms at Plaintiff,

1  and the officers are not entitled to qualified immunity with respect to Plaintiff's

2  Fourth Amendment claim.  Plaintiff claims the firearms were pointed at her, and that a

3  "low-ready" positioning is when unholstered weapons pointed at the ground.

4          Having reviewed the officers' body cam footage, the Court finds that a

5  reasonable juror could find in favor of either Plaintiff or Defendants.  On the one

6  hand, a juror could concluded that the officers held their firearms in a "low-ready"

7  position because there are instances where the firearms appear oriented towards the

8  ground.  (*See e.g.*, Defs.' Ex. O, at 2:31–2:40; Ex. P, at 2:17–2:40.)  On the other

9  hand, there are also instances where it appears the firearm is being held upright, and

10  aimed at Plaintiff.  For instance, in the body cam footage of Officer Downs, it appears

11  from the reflection on the patrol car's window that he had the firearm in an upright

12  position pointed in Plaintiff's direction.  (Defs.' Ex. P, at 1:51–2:13.)  A reasonable

13  juror viewing the footage could conclude that the firearm was pointed directly at

14  Plaintiff, particularly in light of Officer Falossi's testimony that he and multiple

15  officers pointed their firearms at Plaintiff.  (Pl.'s Ex. 2, Falossi Depo. at 156:5–

16  180:23.)  Additionally, while the body cam footage shows that officers had their

17  firearms oriented towards the ground at times, the footage also shows that Plaintiff

18  was ordered to kneel on the ground, and it is unclear whether the downwards pointing

19  firearm was still directed at her.  (*See e.g.,* Defs.' Ex. P 2:18–2:24.)  Accordingly, it is

20  up to a jury to evaluate and weight the evidence to determine whether the officers' use

21  of firearms constituted excessive force.

22                    **2.   Qualified Immunity**

23          The Court finds there is a genuine issue of material fact as to whether

24  Defendants are entitled to qualified immunity on Plaintiff's Sixth Cause of Action

25  under the Fourth Amendment.

26          It is clearly established that "pointing guns at persons who are compliant and

27  present no danger is a constitutional violation." *Thompson v. Rahr*, 885 F.3d 582, 587

28  (9th Cir. 2018) (quoting *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009); *see*

13.

*also Hopkins v. Bonvicino*, 573 F.3d 752, 776 (9th Cir. 2009) (finding excessive force where an officer pointed a weapon at a cooperative, unarmed suspect and did not holster the weapon until after the suspect was handcuffed, and where the officers outnumbered the suspect); *Robinson v. Solano County*, 278 F.3d 1007, 1014 (9th Cir.2002) (finding excessive force where misdemeanor suspect was "apparently unarmed and approaching the officers in a peaceful way[, t]here were no dangerous or exigent circumstances apparent at the time of the detention, and the officers outnumbered the plaintiff"). Moreover, "under clearly established law in this Circuit, 'the crime of vehicular theft . . . without more, does not support a finding that [the suspect] pose[s] a threat' justifying the use of force when the suspect is outnumbered, unarmed, and compliant." *Brown v. Cnty. of San Bernardino*, No. 21-56357, 2023 WL 1793464, at *1 (9th Cir. Feb. 7, 2023); *see also Green v. City and County of San Francisco*, 751 F.3d 1039, 1049–51 (9th Cir. 2014) (reasonable suspicion that suspect stole a vehicle "alone is not enough to justify" pointing firearms at suspect).

However, it is not clearly established whether holding a firearm in the "low ready" position violates the Fourth Amendment. In *Green* the Ninth Circuit found the "degree of the intrusion . . . was severe" where plaintiff was "ordered out of the vehicle by as many as six officers, many of whom pointed handguns and a shotgun directly at her. She was forced to her knees and handcuffed . . . and officers continued to train weapons upon her while she was handcuffed." The Ninth Circuit also noted that the officers' intrusion in *Green* was particularly severe where there were less lethal options; the Court stated, "at the very least, [the officers] could have held their weapons at a 'low ready' position rather than pointing them directly at Green." *Id.* Indeed, the Ninth Circuit later stated, "[t]here can be little question that holding the gun in the low-ready alternative would have been a superior option . . . , rather than pointing it at [plaintiff's] head." *Thompson*, 885 F.3d at 590; *see also Beitch v. Magnus*, 855 Fed. App'x 395, 396 (9th Cir. 2021) (officers were entitled to qualified immunity where officer pointed his firearm "from a distance of four to five cars away,

and then lowered it into the low-ready position" because "[n]o clearly established law holds that such positioning constitutes excessive force.").

Accordingly, the Court cannot find that there is clearly established law that would put the officers on notice that a firearm held in the "low-ready" position violates a suspect's constitutional rights. Notably, there is no Ninth Circuit precedent defining what constitutes a "low-ready" position. In *Green*, the Ninth Circuit simply states that officers "could have held their weapons at a 'low ready' position *rather than pointing them directly at* [the suspect]." *Green*, 751 F.3d at 1050. It is unclear whether "directly at" means a firearm may be pointed at another part of a suspect's body, or must be pointed in a direction such that, if it were fired in that position, the suspect would not be injured in any way. However, the Court need not resolve what constitutes a "low-ready" position because even if the Court accepted Defendants' definition, that a firearm need only be positioned below an officer's line of sight (DSUF ¶ 34), Defendants are not entitled to qualified immunity as a matter of law.

There remains a genuine dispute of material fact: whether the firearms were in fact held in a "low-ready" position. Plaintiff contends that the firearms were pointed directly at her, and Officer Falossi testified that he and Officer Downs pointed their firearms at Plaintiff. A reasonable juror hearing that testimony and watching the orientation of the firearms in the officers' body cam footage could reasonably conclude that Officers Comp, Downs, and Falossi did not hold their firearms in a "low-ready" position and pointed them directly at Plaintiff. Accordingly, the Court cannot find as a matter of law that any Defendant is entitled to qualified immunity. Likewise, because a reasonable juror could conclude that the firearms were held in a "low-ready" position, the Court cannot find as a matter of law that the officers are not entitled to qualified immunity.

### 3. Sergeants Keenaghan and Orth and Officer De La Cruz

It is undisputed that Officer De La Cruz and Sergeants Keenaghan and Orth never pointed their firearm at Plaintiff. While Plaintiff contends in her Cross-Motion

1    that Officer De La Cruz pointed his firearm at the vehicle while Plaintiff was inside,

2    Plaintiff concedes that Officer De La Cruz pointed his firearm towards the passenger

3    side of the vehicle and never pointed his firearm at Plaintiff, never pointed his firearm

4    at the driver side of the vehicle, and never tracked Plaintiff his firearm.  (DSUF ¶¶ 74–

5    78.)  It is also undisputed that Sergeant Orth pointed his firearm towards the passenger

6    side of the vehicle, and Sergeant Keenaghan never drew his firearm.  (DSUF ¶¶ 86,

7    90.)  Based on the undisputed facts, Officer De La Cruz and Sergeants Keenaghan and

8    Orth did not use excessive force.

9            However, they may nevertheless be liable for any excessive force used.  It is

10   "clearly established that 'officers have a duty to intercede when their fellow officers

11   violate the constitutional rights of a suspect or other citizen.' "  *Tobias v Arteaga*, 996

12   F.3d 571, 583 (9th Cir. 2021) (quoting *Cunningham v. Gates*, 229 F.3d 1271, 1289

13   (9th Cir. 2000)).  "If an officer fails to intercede, 'the constitutional right violated by

14   the passive defendant is analytically the same as the right violated by the person who'

15   performed the offending action."  *Id.* (quoting *United States v. Koon*, 34 F.3d 1416,

16   1447 n.25 (9th Cir. 1994), *aff'd in part, rev'd in part on other grounds*, 518 U.S. 81,

17   116 S. Ct. 2035, 135 L.Ed.2d 392 (1996)).  "Officers can be held liable for failing to

18   intercede in situations where excessive force is claimed to be employed by other

19   officers only if 'they had an opportunity to intercede.' "  *Hughes v. Rodriguez*, 41

20   F.4th 1211, 1223 (9th Cir. 2022) (quoting *Cunningham*, 229 F.3d at 1289–90); *see*

21   *also Ramirez v. Butte-Silver Bow Cnty.,* 298 F.3d 1022, 1029–30 (9th Cir. 2002) (no

22   violation of duty to intercede where there was no evidence that the defendant was

23   aware of the constitutional violation as it occurred).

24           Officer De La Cruz was present from the moment Plaintiff pulled over and

25   firearms were unholstered, and would have reasonably been able to observe Officers

26   Comp, Downs, and Falossi's behavior throughout the interaction.  Sergeants

27   Keenaghan and Orth arrived as Plaintiff was walking backwards, and were present to

28   provide supervision to the officers.  Based on when they arrived, they would have

1  been able to observe how the officers used their firearms as Plaintiff walked

2  backwards and kneeled on the ground.  Thus, if a jury found that excessive force was

3  used, a jury could also reasonably find that Officer De La Cruz and Sergeants

4  Keenaghan and Orth had an opportunity to intercede to prevent the use of excessive

5  force.  Because this turns, in part, on the factual dispute as to excessive force,

6  summary judgment is inappropriate.

7       **C.   UNLAWFUL ARREST**

8       Defendants move for summary judgment on Plaintiff's first cause of action for

9  unlawful arrest under Cal. Const. Art. I § 13 and Cal. Civ. Code § 52.1.

10       "There is no bright-line rule to establish whether an investigatory stop has risen

11  to the level of an arrest." *Green v. City and County of San Francisco*, 751 F.3d 1039,

12  1047 (9th Cir. 2014).  The difference between the two depends on the "totality of the

13  circumstances." *Id.*  The Ninth Circuit has only allowed intrusive methods such as

14  holding a suspect at multiple gun points, handcuffs, and requiring a suspect to kneel in

15  "special circumstances," such as "(1) where the suspect is uncooperative or takes

16  action at the scene that raises a reasonable possibility of danger or flight; (2) where the

17  police have information that the suspect is currently armed; (3) where the stop closely

18  follows a violent crime; and (4) where the police have information that a crime that

19  may involve violence is about to occur." *Id.* (quoting *Washington v. Lambert*, 98 F.3d

20  1181, 1189 (9th Cir. 1996)).

21       Defendants argue that Plaintiff's brief detention did not rise to the level of an

22  arrest because the officers acted reasonably to investigating a potential car theft,

23  which is "arguably severe." *Id.* at 1050.  Defendants cite to *Gallegos v. City of Los*

24  *Angeles*, 308 F.3d 987, 991 (9th Cir. 2003), wherein the Ninth Circuit determined that

25  a driver stopped at gunpoint and ordered out of his truck, handcuffed and held in a

26  patrol car for between 45 and 60 minutes was detained, not arrested. *See also U.S. v.*

27  *Rousseau*, 257 F.3d 925, 930 (9th Cir. 2001) (on motion to suppress, firearms and

28  handcuffs did not convert detention into an arrest where officers had reason to believe

1   defendants posed a safety concern); *Alexander v. County of Los Angeles*, 64 F.3d

2   1315, 1321 (9th Cir. 1995) (upholding investigatory stop where, following vehicle

3   stop, officers surrounded car with weapons drawn); *United States v. Alvarez*, 899 F.2d

4   833, 838 (9th Cir.1990) (finding totality of circumstances justified a stop under Terry

5   where police ordered suspect in car to keep hands in view, approached vehicle with

6   their weapons drawn and ordered suspect out of car).  Defendants argue that the use of

7   handcuffs and presence of firearms do not necessarily convert a stop into an arrest, as

8   Plaintiff was only handcuffed for approximately three minutes and the firearms were

9   held in a "low-ready" position.

10       Plaintiff argues that *Terry* stops do not normally involve pat downs,

11   handcuffing, orders to kneel, or being held at gunpoint.  Plaintiff argues this case is

12   analogous to *Green*, where the Ninth Circuit ultimately found that a jury could

13   reasonably find Green had been arrested.  In *Green* the plaintiff was suspected of

14   stealing a vehicle based on an inaccurate ALPR hit and was subject to "highly

15   intrusive methods" where Plaintiff was held at multiple gun points, handcuffed, and

16   directed to her knees.  *Id.* at 1047.  The officers did not confirm that the license plate

17   had been stolen; in fact, the ALPR misread the license plate.  *Id.* at 1042–43.

18   Nevertheless, the officers pulled her over, ordered her out of the car, to walk

19   backwards, get on her knees despite it causing her physical pain to do so, and

20   handcuffed her.  *Id.* at 1043.  Multiple firearms were pointed at her during this time,

21   and Plaintiff was outnumbered by four to six officers.  *Id.*  Green estimated she was in

22   handcuffs for approximately ten minutes, during which firearms were still pointed at

23   her while her vehicle was investigated.  *Id.* at 1049.

24       Like in *Green*, the Court finds that "a rational jury could find that the tactics

25   were not reasonable given the totality of the circumstances and that [Plaintiff] was

26   subject to an arrest." *Id.* at 1048.  The officers used highly intrusive tactics.  Multiple

27   officers unholstered their firearms and, viewing the evidence in the light most

28   favorable to Plaintiff, pointed those firearms at her.  Additionally, the officers "lacked

1    any specific information that [Plaintiff] was armed, . . . [Plaintiff] was compliant with

2    instructions at all times, . . . there was no evidence of recent violence, and . . . the

3    police significantly outnumbered [Plaintiff] so as to diminish the risk she posed." *Id.*

4    For all these reasons, the Court finds there is a genuine dispute of material fact that

5    must be resolved by a jury.  Accordingly, summary judgment is **DENIED** on these

6    grounds.

7         **D.    UNLAWFUL SEARCH**

8         Defendants move for summary judgment on Plaintiff's fourth cause of action

9    for unreasonable search under Cal. Const. Art. 1 § 13.  Defendants argue a cursory

10   pat-down is justifiable for officer safety when investigating a felony.  Because the

11   license plate was confirmed to belong to a stolen vehicle, the officers' stop, search,

12   and temporary seizure was constitutionally reasonable.

13        Although it is undisputed the officers had reasonable suspicion the vehicle was

14   stolen, it does not follow that the search was reasonable.  "A lawful frisk does not

15   always flow from a justified stop." *United States v. Thomas*, 863 F.2d 622, 628 (9th

16   Cir. 1988).  "The standard for justifying a frisk is whether a reasonably prudent person

17   in the circumstances would be warranted in the belief that his or her safety or that of

18   others was in danger." *Id.*  There are no facts to suggest that Plaintiff posed a safety

19   threat.  "The fact that [Plaintiff] was stopped on suspicion of a stolen vehicle does not

20   by itself demonstrate that she presented a danger to the other officers." *Green*, 751

21   F.3d at 1048.  Indeed, even the body cam footage of Officer Comp, who conducted

22   the search, shows that Plaintiff wore tight fitting athletic clothing and a cropped denim

23   jacket; there was nothing to suggest that something was concealed in her clothing or

24   jacket, and as Plaintiff walked backwards, the back of her shirt rose, revealing her

25   bare back, meaning no weapon could have been concealed in her waist band.

26        Absent Plaintiff's consent, Defendants' search of Plaintiff was unreasonable

27   under the circumstances.  However, there is a genuine dispute over whether Plaintiff

28   consented.  Plaintiff contends that she was sobbing when Officer Comp asked if he

                                        19.

1   could search her, not consenting; whereas, Officer Comp contends that he reasonably

2   interpreted Plaintiff's response as consent.  It is not clear from the body cam footage

3   whether Plaintiff had acted in a way that could have lead Officer Comp to reasonably

4   believe she had consented.  This is a matter for a jury to decide, thus summary

5   judgment is inappropriate.

6   　　　　　　Accordingly, Defendants' Motion is **DENIED** on these grounds.

7   　　　**E.**　　**CAL. CIV. CODE § 52.1 (BANE ACT)**

8   　　　　Both parties move for summary judgment on Plaintiff's third cause of action for

9   deprivation of rights in violation of Cal. Civ. Code § 52.1 (the "Bane Act").

10   　　　　Plaintiff contends she prevails under the Bane Act because the undisputed facts

11   show the officers used excessive force.  Defendants argue they are entitled to

12   summary judgment because the Bane Act requires "a showing of the defendant's

13   specific intent to violate the plaintiff's constitutional rights." *Rodriguez v. Cnty. of*

14   *Los Angeles*, 891 F. 3d 776, 802 (9th Cir. 2018).  However, where a plaintiff

15   "provide[s] evidence sufficient to support a finding they were subjected to excessive

16   force in violation of [a constitutional right], they necessarily provided evidence

17   sufficient to support a finding of a violation of their rights under § 52.1." *Id.*; *see also*

18   *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105–06 (9th Cir. 2014) (reversing

19   dismissal of § 52.1 claim where plaintiff prevailed on its excessive force claim under

20   § 1983 because "a successful claim for excessive force under the Fourth Amendment

21   provides the basis for a successful claim under § 52.1."); *Cameron v. Craig*, 713 F.3d

22   1012, 1022 (9th Cir.2013) ("[T]he elements of the excessive force claim under § 52.1

23   are the same as under § 1983.").

24   　　　　Having already found that there is a genuine dispute as to material fact

25   regarding whether the officers used excessive force, Plaintiff's Cross-Motion and

26   Defendants' Motion are **DENIED** on these grounds.

27   　　　**F.**　　**ASSAULT AND BATTERY**

28   　　　　Plaintiff's fifth cause of action for assault and battery is based on Officer

Comp's use of handcuffs. (*See* Third Amended Complaint (Dkt. No. 35), ¶ 81.) Plaintiff contends that she is entitled to summary judgment on this claim "depending on whether the basis for the finding on her Sixth Claims relates to handcuffing or not." (Cross-Motion at 28.) However, her arguments regarding the officers' use of force focuses solely on the use of firearms. Similarly, Defendants in their Notice of Motion identify that they are moving on Plaintiff's fifth cause of action based on the reasonableness of the officers' actions, but focuses their Motion entirely on the use of firearms. Indeed, Defendants' argument on the reasonableness of the force is specific to Plaintiff's sixth, first, second, and fourth causes of action, not Plaintiff's fifth cause of action. (*See* Motion at 11.)

Plaintiff has offered no arguments or evidence regarding why the use of the handcuffs, or how the handcuffs were used, constitutes excessive force. For example, Plaintiff does not argue that the handcuffs were applied too tight, or that Plaintiff was injured as a result of the handcuffs. *See e.g., Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989) (unreasonably injuring plaintiff's wrists while applying handcuffs constitutes use of excessive force).

Similarly, Defendants' arguments relating to the use of handcuffs are intertwined with their arguments relating to whether the use of handcuffs converted the stop to an arrest. Because there is a genuine dispute over whether the use of handcuffs, among other factors, was reasonable under the totality of the circumstances, the Court finds there is also a genuine dispute as to whether the use of handcuffs constituted assault and battery. *See Fortson v. City of Los Angeles*, 628 F. Supp. 3d 976, 994 (C.D. Cal. 2022) ("Because there are genuine disputes of material fact regarding whether the Officer Defendants' use of force was reasonable, summary judgment is not appropriate on Plaintiff's assault and battery claim.").

Accordingly, Plaintiff's Cross-Motion and Defendants' Motion are **DENIED** on these grounds.

//

G.   ***MONELL* VIOLATION**

Both parties move for summary judgment on Plaintiff's eighth cause of action against the City for violation of *Monell*.

A local governmental entity can be sued under § 1983 where a municipal policy or custom has caused an alleged violation of constitutional rights.  *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690–91 (1978).  A municipality cannot, however, be held liable under § 1983 "*solely* because it employs a tortfeasor— or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  *Id.* at 691 (emphasis original); *see also Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) ("We have consistently refused to hold municipalities liable under a theory of respondeat superior.").  There are three ways to establish municipal liability under Section 1983: (1) by showing a longstanding practice or custom which constitutes the municipality's standard operating procedure, (2) by showing that that an official with final policymaking authority made the decision, or (3) by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.  *Ulrich v. City & Cty. of S.F.*, 308 F.3d 968, 984–85 (9th Cir. 2002).  Further, Plaintiff "must show both causation-in-fact and proximate causation."  *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1096 (9th Cir. 2013).

The Court focuses on the first method of establishing liability, as Plaintiff contends the City's violation is based on a longstanding practice or custom.  Defendants' argument that the City does not have a policy of pointing firearms directly at suspects misses the point.  There is no real dispute that Defendants effectuated the stop in accordance with the City's policies.  BHPD Officers have been trained to use "high-risk" stop tactics in circumstances that involve a potentially stolen vehicle.  Accordingly, a jury could easily find that the officers' decisions to call for back up, unholster their firearms, order Plaintiff onto her knees, and handcuff her were the direct and proximate result of their training and the City's use of force policies.

22.

Thus, if a jury finds that BHPD's practices resulted in a constitutional violation, they can also find that the City's longstanding practice or custom caused the constitutional violation.  Accordingly, Defendants' Motion is **DENIED**.  Additionally, because there remains a genuine dispute over whether there was a constitutional violation, Plaintiff's Cross-Motion is **DENIED**.

### H.   PUNITIVE DAMAGES

To recover for punitive damages against an individual officer in a Section 1983 case, a plaintiff must show that the officers' conduct is "motivated by evil motive or intent" or "involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).  The Ninth Circuit has also explained that "[t]he standard for punitive damages under § 1983 mirrors the standard for punitive damages under common law tort cases," which extends to "malicious, wanton, or oppressive acts or omissions." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005).

Similarly, punitive damages may be appropriate under California law if a plaintiff establishes "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a).  Malice may be shown where the defendant exhibits "the motive and willingness to vex, harass, annoy, or injure," *Nolin v. Nat'l Convenience Stores, Inc.*, 95 Cal. App. 3d 279, 285 (1979) (quoting *Davis v. Hearst*, 160 Cal. 143, 162 (1911)), or a "conscious disregard of the rights and safety of others," *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1000 (1993).

As discussed previously, there is a dispute of material fact as to whether the officers intended to use excessive force.  For similar reasons, there are genuine disputes of material fact regarding whether the officers acted with an evil motive or intent or with malice.  Defendants' motion for summary judgment on the issue of punitive damages is therefore **DENIED**.

//

1  **VI.    CONCLUSION**

2          Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to

3  Plaintiff's Seventh Cause of Action.  Defendants' Motion is otherwise **DENIED**.

4  Plaintiff's Cross-Motion is **DENIED**.

5

6  Dated: August 18, 2023

7  _____

8  HONORABLE ANDRÉ BIROTTE JR.
   UNITED STATES DISTRICT COURT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24.